UNITED STATES of America,
Plaintiff-Appellee,

v.

Arnulfo RODRIGUEZ and Daniel Granado, Defendants-Appellants.

No. 81–2170
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Oct. 1, 1982.

Hector De Pena, Jr., Corpus Christi, Tex., (Court-appointed), for Granado.

Albert A. Pena, III, Corpus Christi, Tex., for Rodriguez.

Daniel K. Hedges, U.S. Atty., James R. Gough, Asst. U.S. Atty., Houston, Tex., W. W. Torrey, Asst. U.S. Atty., Corpus Christi, Tex., for United States.

Before BROWN, GEE and JOLLY, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

In February of 1981, a jury found Arnulfo Rodriguez and Daniel Granado guilty of conspiracy to kill a federal agent while engaged in the performance of his official duties, in violation of 18 U.S.C. §§ 1114 and 1117. Defendant Rodriguez was sentenced to prison for life, defendant Granado for 30 years. Both men appeal their convictions.

Statements made to a government informant by Adan Rangel, a coconspirator, were admitted into evidence at the two men's trial. These statements would have been adjudged inadmissible hearsay save for the provisions of Fed. R. Evid. 801(d)(2)(e). In order to avail itself of that hearsay exception, the government must meet the standards set forth in *United States v. James,* 590 F.2d 575 (5th Cir. 1979) (en banc). The heart of appellants' appeal is their contention that the prosecution in their case did not meet those standards.

Collaterally, appellants urge that absent Rangel's out-of-court declarations, insufficient evidence exists to sustain their convictions. In addition, appellant Granado contends that the trial judge erred in "not recognizing and considering that the alleged weapon used was inoperative."

The facts on appeal are not in dispute. Special Agent Leonard L. (Wes) Alphin of the Drug Enforcement Administration (DEA) employed Viola Reyes as an informant. She had introduced him, as "Chris," to Adan Rangel, from whom Alphin had subsequently bought heroin. On past occasions, Rangel had told Reyes that he was suspicious of Alphin.[1] Around 5 o'clock in the afternoon on September 12, 1980, Rangel telephoned Reyes, reiterated his suspicions, and informed her that he had recruited two people to stake out Alphin's vehicle. Reyes testified that Rangel told her: "And if he walks out of the building into the truck, it's like he knows too much, or he's old, too old. That we can put him away or something like that."

At about the same time, a DEA secretary leaving work happened to notice both appellants looking into Agent Alphin's truck. Reyes called Alphin at the DEA office approximately thirty minutes later to warn him of Rangel's threat. Peering from their office windows after that call, Alphin and other DEA personnel spotted Rodriguez and Granado seated on a park bench facing the DEA building. At approximately 5:45 p.m., Granado walked away, returning shortly thereafter with a newspaper which concealed two pistols. Rodriguez took one of the pistols and placed it in a paper bag. Several minutes later, both men waved at a

---

1. Rangel had at least once seen a pickup truck sometimes driven by Alphin parked in front of the DEA building. On the day in question, the truck was in a government parking area.

passing automobile. Granado again disappeared, soon to return in the car with two other men. He stopped briefly to talk with Rodriguez on the street near the park bench, then left in the automobile.

Not long after, Rodriguez was arrested with the pistol beside him still in the paper bag. A box of .22 caliber hollow point shells was in his pocket. After his arrest, he was caught stuffing several of Rangel's business cards behind the seat of the police cruiser. Several hours later, Granado was arrested in the general vicinity.

After being advised of his rights, Rodriguez gave an oral statement to DEA agent Frank Garcia. He admitted that he had agreed with Rangel to kill Agent Alphin for either two ounces of heroin or $4,000. He claimed, however, that he did not intend actually to carry out the plan; instead, he planned to set Rangel up for a robbery. According to the statement, Rangel had told Rodriguez that he wanted Alphin killed because a friend had purchased drugs from Alphin. Rodriguez also told Garcia that earlier that afternoon Rangel had showed him Alphin's truck and instructed him that "the Fed was to be hit." After making sure "that he got close enough to do a good job," Rodriguez was to drive Alphin's truck to the outskirts of town, where Rangel would be waiting with the payoff. Rodriguez further told Agent Garcia that Granado knew nothing about the plot against Alphin.

■ *James, supra,* articulates the requirements which the government must satisfy in order to rely upon Fed. R. Evid. 801(d)(2)(E). Before the jury may hear such testimony, the trial court must believe that there is substantial independent evidence of a conspiracy between the defendant and the declarant and that the statements were uttered in furtherance of that conspiracy. At the end of the trial, the court must further decide, as a question of fact, "whether the prosecution has shown by a preponderance of the evidence independent of the statement itself (1) that a conspiracy existed, (2) that the coconspirator and the defendant against whom the

coconspirator's statement is offered were members of the conspiracy, and (3) that the statement was made during the course and in furtherance of the conspiracy. Rule 801(d)(2)(E). If the court concludes that the prosecution has not borne its burden of proof on these issues, the statement cannot remain in the evidence to be submitted to the jury." *United States v. James,* 590 F.2d at 582–83.

The trial court followed the procedure outlined in *James.* Appellants nonetheless contend that Rangel's statements to Reyes should not have been admitted. Specifically they argue, first, that no substantial evidence of conspiracy exists independent of Rangel's statements and, second, that those statements were not designed to further the alleged conspiracy.

■ Having examined the record, we conclude that substantial independent evidence of conspiracy, and of the defendants' involvement in it, was presented to the court.

In considering the matter at the end of the trial, the judge pointed to three features of the testimony upon which he based his determination. One was the actions of Rodriguez and Granado as observed through the DEA office windows. A second was the testimony of the DEA secretary. The third was Rodriguez' statement itself. Although Rodriguez denied that he intended to kill Agent Alphin, in his statement he admitted all other aspects of the conspiracy. We would also include Rodriguez' acrobatic attempt, while handcuffed, to rid himself of Rangel's business cards.

■ If the trial judge has faithfully and conscientiously complied with the procedures set forth in *James,* this Court will not overturn the judge's finding unless it is "clearly erroneous." *United States v. Dean,* 666 F.2d 174, 179 (5th Cir. 1982). Certainly the District Court committed no clear error here in finding that a preponderance of the evidence pointed to the existence of a conspiracy which included Rangel and the two defendants.

While considering whether to admit Rangel's statements, the trial judge himself

stated, "As far as being in furtherance of the conspiracy, that's a close question."

In answering *yes* to that question, the court relied primarily on other testimony of Viola Reyes. At the preliminary *James* hearing, during the examination of Reyes, both the court and the attorneys diligently pursued the issue of why Rangel had called Reyes to tell her of his plans. Her answers were not conclusive. They indicated, however, that Rangel had several times confided in her his suspicions of Agent Alphin and had asked her for information or reassurance.[2] The trial judge after hearing the evidence was satisfied that Rangel's call was "more than just mere chatter over a cup of coffee." From the testimony, the judge concluded that Rangel was either warning Reyes or attempting to pump her one last time for either confirmation or a convincing denial that Alphin was a federal agent. The defense presented no evidence to support a different explanation.

This Court has shunned an overly literal interpretation of the phrase "in furtherance of the conspiracy." "Although this phrase has a talismanic ring to it, we must not apply the standard too strictly, lest we defeat the purpose of the exception." *United States v. James,* 510 F.2d 546, at 549 (5th Cir. 1975).[3] *See also United States v. McGuire,* 608 F.2d 1028 (5th Cir. 1979); *United States v. Miller,* 664 F.2d 94 (5th Cir. 1981). Following this guide, the trial court did not err in finding Rangel's conversation with Reyes to have been in furtherance of the conspiracy. Whether it was, as the judge remarked, a "close question," the answer is supported by the evidence. Accordingly, we hold that Reyes' testimony as to Rangel's statements was properly admitted.

2. THE COURT: Well, let me ask you something, Mrs. Reyes. This what I want to know: Why was Adan calling you anyway? I mean what was the purpose of telling you this? Was he just passing the time of day with you or was he wanting your advice or what? What were the circumstances of him calling you?
THE WITNESS: He always called me, or he confided in me a lot; especially when it had something to do with Chris. He would tell me what he was going to do next or what he was going to do or what he thought he'd do; you know, if he was an agent and things like that, you know.
R. Vol. II, at 131.
Q: So, in other words, what you're saying is that you are testifying that at least on two occasions they were trying to get information from you to get your reaction?
A: Yes.
Q: To see what you would say about this Chris?
A: Yes, sir.
R. Vol. II, at 135.
Q: So then this phone call that you got on September 12, do you think he was still trying to test you about your knowledge about Chris? About Wes Alphin? Do you think he wanted to see a reaction?
A: Maybe. But I guess he just wanted to let me know what was happening or what was going to happen. To be on the alert or something. I don't know.
R. Vol. II, at 137–38.
Q: And from time to time Rangel called you to sort of challenge you as to whether or not the man is really an agent? He would express suspicions about the man?
A: Yes, sir.
Q: And you would each time try to allay his suspicion? You would try to assure him that the man was not an agent?
A: Yes, sir.
Q: And then at one point he told you about having traced the man's truck to the DEA building and seeing him come out of the building?
A: Yes, sir.
Q: And then on September 12 he phoned you to recall that conversation to you and tell you that he was going to have somebody up there to see whether or not the agent got into the truck? And that was going to be the test so to speak?
A: Yes, sir. When he called me, I think he already had the guys there....
Q: All right. And how did you leave that conversation with him? I mean did you—Again as I understand it, you again assured him that you thought the man was not an agent?
A: Yes, sir. Because at this time I knew that Chris wasn't driving that truck anymore. So I told him, well, I know it's not, it's not Chris. You know, you're wrong.
R. Vol. II, at 149–50.

3. This case should not be confused with the later and unrelated *James* case, 590 F.2d 575 (5th Cir. 1979), *supra.* The defendant in the 1975 case was Elorance James. The defendant in the 1979 case was Donald James.

Given our disposition of this issue, we need not ponder appellants' contention that the remaining evidence is inadequate to convict them of conspiracy to kill a federal agent. Including Reyes' testimony, the evidence clearly is sufficient.

Finally, appellant Granado refers in his brief to expert testimony concerning the gun found with Rodriguez.[4] Presumably, this gun was brought to Rodriguez by Granado. Granado argues rather perfunctorily that the gun was shown to be "basically an inoperable weapon," and that therefore he must necessarily have lacked the intent prerequisite to his being convicted on conspiracy charges. We find this argument to be without merit. Appellant offers no evidence to suggest that he deliberately or even knowingly supplied Rodriguez with a defective gun. Moreover, the expert testimony to which appellant alludes showed the weapon to be cumbersome and slow rather than "inoperable."

The actions of the District Court were correct.

AFFIRMED.

4. In a separate case arising from these events and involving the same gun, Rodriguez was found guilty of possession of a firearm by a convicted felon. That conviction was affirmed by this Court in *United States v. Rodriguez*, No. 81–2307 (5th Cir. Aug. 4, 1982) (unpublished opinion).