UNITED STATES of America, Appellee,

v.

**Tillman J. BENTLEY, Appellant.**

UNITED STATES of America, Appellee,

v.

**Nathan PLATT, Appellant.**

**Nos. 82–1696, 82–2337.**

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 12, 1983.

Decided April 15, 1983.

Rehearing Overruled June 2, 1983.

1501

Thomas E. Dittmeier, U.S. Atty., Richard L. Poehling and David M. Rosen, Asst. U.S. Attys., St. Louis, Mo., for appellee.

Norman S. London, Jayne E. Knobbe, London, Greenberg & Pleban, St. Louis, Mo., for appellant Bentley.

Norman Alan Lubin, Alan Bryant Chambers, Memphis, Tenn., for appellant Platt.

Before ROSS, Circuit Judge, HENLEY, Senior Circuit Judge, and FAGG, Circuit Judge.

HENLEY, Senior Circuit Judge.

In these consolidated appeals, Tillman J. Bentley and Nathan Platt challenge their convictions for certain drug-related offenses. We affirm.

I

From the evidence adduced at trial, the background of these cases may be briefly reconstructed as follows. In August of 1981 the president of Advance Engineering, a St. Louis company engaged in the manufacture of pharmaceutical punches and dies, contacted the Drug Enforcement Agency (DEA) concerning an unusual inquiry he had received in connection with the purchase of a tablet press. While negotiations continued with respect to the purchase, the DEA initiated an investigation and began surveillance of the company premises. Prior to the consummation of the sale, agency officials secured the approval of a United States Magistrate for the installation and monitoring of an electronic tracking device,[1] which was placed in a wooden pallet connected to the tablet press.

In addition to the press, tooling designed with the name "Lemmon 714," the imprint of a pharmaceutical company which produced methaqualone, a controlled substance, was also to be purchased. This tooling had been selected by appellant Nathan Platt during negotiations for the sale of the tablet press, and was subsequently installed in the machine.

On August 26 Platt and Ralph Reff arrived at Advance Engineering to pay the balance of the purchase price and pick up the press. Platt placed the equipment in a pickup truck and departed; Reff subsequently left in a separate vehicle.

Utilizing the electronic tracking device as well as visual surveillance, DEA agents followed Platt, who eventually took the tablet press to the rural property of appellant Tillman Bentley, a physician. There, the machine was unloaded and placed in a shed. Surveillance continued uneventfully until September 14, when the press was moved to another location. While tracking this move, the agents lost the signal from the transmitting device in a rural area. In attempting to relocate the signal and tablet press on foot, they purportedly inadvertently entered the property of Gary Black,[2] where the press was discovered in the pickup truck, which had been backed into a small barn.

The press was not moved again until September 30, when it was taken to the property of Gary Combs. Shortly after this move, the agents began to experience difficulties with the tracking device. After obtaining a search warrant, they entered Combs's property to ascertain the feasibility of replacing the device. When this examination indicated that replacement was possible, the agents sought and received a second warrant which authorized the placement of two new tracking devices, one in the pallet and the other on the undercarriage of the truck. Following the installation of the devices, a court order permitting continued surveillance was issued.

On November 5 DEA agents received warrants for the seizure of the tablet press and the arrest of Gary Combs. Also on this date the agents were notified by Advance Engineering that an inquiry had been made concerning the return of the machine. After the issuance of the warrants, Combs was arrested and the press seized. Combs

---

1. The tracking device, or beeper, emitted periodic signals which could be picked up by a receiver.

2. The entry onto Black's property occurred on a foggy night in a rural area. It is said that in following what they believed to be a public road, the agents had actually entered the property through a driveway.

agreed to cooperate with the authorities, and with his consent two telephone calls and a meeting with Gary Black were subsequently recorded.

The investigation culminated with indictments against Black, Bentley and Platt. Both Platt and Bentley were charged with conspiracy to manufacture methaqualone, in violation of 21 U.S.C. § 841(a)(1), and, in separate counts, with possession of punches and dies designed to imprint a pharmaceutical company marking for methaqualone, in violation of 21 U.S.C. § 843(a)(5). Platt's motion for severance was granted, and following a joint jury trial both Bentley and Black were convicted. Platt was convicted in a subsequent jury trial. These appeals followed.

## II

Both Bentley and Platt initially contest the propriety of the judicially authorized electronic surveillance and the resulting seizure of the tablet press. Specifically, appellants urge (a) that the warrants which originally permitted the surveillance were unlawful because they were not supported by probable cause; and (b) that the warrants issued subsequent to the agents' entry onto the property of Gary Black were unlawful because the agents had entered that property illegally. We examine these contentions in turn.

## A

In challenging the propriety of the warrants that sanctioned the electronic surveillance, appellants focus upon information supplied to the authorities by a confidential informant,[3] which served as the primary basis for the original affidavit and search warrant request. They contend that the affidavit did not sufficiently demonstrate probable cause, that the surveillance was therefore unlawful and that any evidence obtained incident to the warrants' execu-tion consequently should be suppressed. Although we find that a close question may be presented, we conclude that the challenged affidavit adequately established probable cause.

The original warrant was issued on the basis of information contained in an affidavit signed by Anton Wagner, a St. Louis police detective assigned to DEA work. In essence, the affidavit recited the following: In August of 1981 Wagner received information from a confidential informant concerning the purchase of a tablet press. This informant had provided information on prior occasions concerning violations of state and federal controlled substance laws. On each of these occasions, Wagner or other DEA agents had verified the information's accuracy, and the tips have resulted in the arrest of at least four persons, with cases pending. The information received in August of 1981 indicated that individuals using the names "R. Reff" and "Irv Fischer" had ordered a tablet manufacturing press from Advance Engineering and Manufacturing Company in St. Louis County, Missouri. The informant further stated that in addition to the press, these individuals had also ordered a set of punches and dies bearing the marking "Lemmon 714"; this mark was recognized by Wagner as a pharmaceutical identification for tablets of methaqualone, a controlled substance. Based on the information Wagner had received, the DEA conducted an investigation which revealed that neither "R. Reff" nor "Irv Fischer" was a licensed registrant with the agency for the manufacture of methaqualone and verified the existence and legitimacy of Advance Engineering.

On the basis of this information, Wagner sought judicial authorization to install the electronic tracking device and to monitor the movement of the press. This authorization was granted by a United States Magistrate on August 18, 1981.

---

**3.** Appellants also question the district court's refusal to compel disclosure of the identity of the confidential informant. Assuming this claim was properly preserved for appellate review, we find no error. We are not convinced that disclosure was relevant or required for essential fairness. *See McCray v. Illinois,* 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1966); *Roviaro v. United States,* 353 U.S. 53, 60–61, 77 S.Ct. 623, 627–28, 1 L.Ed.2d 639 (1957); *United States v. Skramstad,* 649 F.2d 1259, 1265 (8th Cir.1981).

**1504**

■ Our evaluation of the adequacy of this affidavit is guided by the principles delineated by the Supreme Court in *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). In order to adequately establish probable cause, an affidavit based upon information provided by an undisclosed informant must (1) set forth some of the underlying circumstances necessary to enable the judicial officer to independently judge the validity of the informant's conclusions, and (2) reveal facts sufficient to allow a determination of either the credibility of the informant or the reliability of his information. *Aguilar,* 378 U.S. at 114, 84 S.Ct. at 1514; *see also, e.g., United States v. Carlson,* 697 F.2d 231, 237 (8th Cir.1983). In the absence of circumstances indicating the basis of the information, a tip may satisfy the first prong of the *Aguilar* standard if it describes the "criminal activity in sufficient detail that the magistrate may know that he is relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation." *Spinelli,* 393 U.S. at 416, 89 S.Ct. at 589.

■ We are also mindful of the fact that courts "evince a strong preference for searches made pursuant to warrant, and, in some instances, may sustain them where warrantless searches based on a police officer's evaluation of probable cause might fail." *Carlson,* 697 F.2d at 237 (*quoting United States v. Brown,* 584 F.2d 252, 256 (8th Cir.1978), *cert. denied,* 440 U.S. 910, 99 S.Ct. 1220, 59 L.Ed.2d 458 (1979)). Further, "reviewing courts should interpret affidavits for search warrants in a commonsense and realistic fashion, and deference is to be accorded an issuing magistrate's determination of probable cause." *Id.* (*quoting United States v. Leichtling,* 684 F.2d 553, 555 (8th Cir.1982), *cert. denied,* — U.S. —, 103 S.Ct. 1184, 75 L.Ed.2d 431 (1983)).

■ Applying these principles to the present case, we are satisfied that the affidavit in question provided a sufficient basis for the magistrate's finding of probable cause. Appellants' primary contention is that many of the facts recited in the affidavit reflect actions which do not alone constitute criminal activity. As we recently noted, however,

[the] observation of apparently innocent acts "can be significant to a trained officer" and ... the officer is "entitled to assess probable cause in light of his experience." ... In addition, "[i]t is settled in this circuit that when an application for a warrant is being considered, the issuing magistrate may properly rely on normal inferences drawn by the surrounding circumstances and the allegations of facts contained in the affidavit."

*Carlson,* 697 F.2d at 238 (citations omitted). In this case, the informant's tip indicated that two named individuals had arranged for the purchase of a tablet press and dies designed to imprint a pharmaceutical marking recognized by the authorities as a trade name for methaqualone; subsequent investigation revealed that neither of the purchasers was a licensed registrant for the manufacture of this controlled substance.[4] We are satisfied that this information, along with the remaining facts recited in the affidavit, raised more than a mere suspicion or conclusion of criminal activity. An affidavit need only establish the probability of such activity; proof beyond a reasonable doubt is not required. *See Spinelli,* 393 U.S. at 419, 89 S.Ct. at 590.

■ Appellants also contend the affidavit failed to sufficiently demonstrate the credibility of the informant. As indicated, however, it stated that prior information supplied by this person had been verified by DEA agents and had led to at least four prior arrests, with cases pending. We have previously concluded that past performance

4. In this connection, we also observe that 21 U.S.C. § 843(a)(5), which prohibits the possession of dies capable of rendering a drug a counterfeit substance, has been interpreted to apply "whether or not the possessor uses or intends to use the die for that purpose." *United States v. Gesualdi,* 660 F.2d 59, 60 (2d Cir. 1981) (per curiam).

by an informant resulting in arrests may be sufficient to establish the credibility of that informant. *United States v. Skramstad,* 649 F.2d 1259, 1262 (8th Cir.1981); *United States v. Fleming,* 566 F.2d 623, 625 (8th Cir.1977). The information concerning the past performance of this informant, in the circumstances of this case, adequately demonstrated his credibility.

In sum, we are satisfied that the affidavit in the present case was sufficient to establish probable cause. Having reviewed all the contentions raised by the appellants in this regard, and finding that none compels a contrary conclusion, we uphold the issuance of the search warrants.[5]

### B

■ As indicated, appellants also contend the warrants permitting government agents to enter the property of Gary Combs were unlawful, focusing on the prior warrantless excursion onto Gary Black's land. This contention requires little discussion. Neither Bentley nor Platt has asserted an ownership or possessory interest in the property. Thus, because the disputed governmental intrusions did not impinge upon a constitutionally-protected interest of either appellant, neither may challenge the

legality of those actions on fourth amendment grounds. *See United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

### III

Appellant Bentley also assigns as error numerous district court rulings made during his joint trial with codefendant Gary Black. We examine these contentions separately.

### A

At trial, James Black, over the defendants' objection, testified concerning conversations he had with Gary Black in September, 1981. In addition to informing James Black about the purchase of the tablet press and its planned use in the manufacture of quaaludes, and requesting his assistance in moving the machine from Dr. Bentley's property and storing it elsewhere, Gary Black purportedly stated in these conversations that Bentley's role in the scheme was to mix the precursor chemicals and actually produce the tablets. James Black further testified with respect to an argument between Bentley and Gary Black concerning the movement of these chemicals when

---

5. We also note that, at least arguably, the monitoring challenged in this case does not implicate the fourth amendment. Where the person invoking the protection of that amendment cannot demonstrate that a legitimate expectation of privacy has been invaded by the government's action, the utilization of an electronic tracking device has been held not to constitute a "search" for fourth amendment purposes. *See United States v. Knotts,* —— U.S. ——, ——————, 103 S.Ct. 1081, 1086, 75 L.Ed.2d 55 (1983) (use of beeper to monitor progress of automobile on public highway did not invade any legitimate expectation of privacy); *see also, e.g., United States v. Bruneau,* 594 F.2d 1190, 1194 (8th Cir.), *cert. denied,* 444 U.S. 847, 100 S.Ct. 94, 62 L.Ed.2d 61 (1979) (no expectation of privacy in airborne location of plane). In this context, where the property in which the tracking device has been placed constitutes contraband, stolen goods or similar items, courts have consistently concluded that the use of electronic surveillance does not implicate the fourth amendment, *see, e.g., United States v. Pringle,* 576 F.2d 1114, 1119 (5th Cir. 1978) (tracking device placed in package of

heroin); *United States v. Emery,* 541 F.2d 887, 890 (1st Cir.1976) (tracking device placed in packages of cocaine); *cf. United States v. Perez,* 526 F.2d 859, 868 (5th Cir.), *cert. denied,* 429 U.S. 846, 97 S.Ct. 129, 50 L.Ed.2d 118 (1976) (tracking device placed in television bartered in heroin trade), reasoning that persons can have no legitimate expectation of privacy in articles of this nature, which they have no right to possess. *E.g., Emery,* 541 F.2d at 890; *see Perez,* 526 F.2d at 863. The property bearing the tracking device in this case is arguably of the same nature as that in the above-cited decisions. As indicated, see note 4, *ante,* 21 U.S.C. § 843(a)(5) prohibits the possession of dies capable of rendering a drug a counterfeit substance; the dies attached to the tablet press in the present case fall within that provision. For this reason, the press and dies arguably could be viewed as property which neither appellant had any right to possess, and in which they therefore could have no legitimate expectation of privacy. However, we need not base our decision on this reasoning, and we intimate no view as to its propriety.

James and the latter went to Bentley's farm to move the tablet press on September 14. Gary Combs also testified, relating the substance of conversations between himself and Gary Black prior to the time the press was taken to Combs's property. The consensually recorded telephone calls between Combs and Gary Black, along with the recording of their November 6 meeting, were also introduced as evidence and played for the jury. In essence, Bentley contends the statements attributed to Gary Black in the above-described testimony were hearsay and therefore should not have been admitted. The government, in contrast, asserts that the statements were admissible as declarations of a coconspirator pursuant to Fed.R.Evid. 801(d)(2)(E).

■ The Federal Rules of Evidence provide that a statement is not hearsay if it is offered against a party and constitutes "a statement by a coconspirator of [the] party during the course and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E). Before an out-of-court declaration may be admissible against a defendant under this provision, the government must demonstrate (1) that a conspiracy existed; (2) that the defendant and the declarant were members of the conspiracy; and (3) that the declaration was made during the course and in furtherance of the conspiracy. *E.g., United States v. Bell,* 573 F.2d 1040, 1043 (8th Cir.1978). Admissibility of such statements is conditioned upon the development of sufficient independent evidence to establish the existence of a conspiracy. In determining whether sufficient independent evidence has been presented, the district court applies the "preponderance of the evidence" standard of proof; that is, "if on the independent evidence the district court is satisfied that it is more likely than not that the statement was made during the course and in furtherance of an illegal association to which the declarant and the defendant were parties," *id.* at 1044, the out-of-court statement is admissible. "The independent evidence of illicit association may be completely circumstantial, or may consist of the conspirator's own conduct and admissions." *United States v. Williams,* 604 F.2d 1102,

1113 (8th Cir.1979) (*quoting United States v. Scholle,* 553 F.2d 1109, 1117 (8th Cir. 1977), *cert. denied,* 434 U.S. 940, 98 S.Ct. 432, 54 L.Ed.2d 300 (1978)).

■ In the present case, Bentley initially contends insufficient independent evidence of a conspiracy was introduced. We disagree. The trial testimony indicated a tablet press with attached dies was purchased under suspicious circumstances by persons who were not licensed registrants and transported in the evening to the rural home of Dr. Bentley, where it was unloaded and stored. A DEA agent conducting surveillance at that time identified Bentley as one of the persons who unloaded the machine. The press remained on Bentley's property for approximately three weeks, after which it was again moved during evening hours on two occasions, first to the property of Gary Black and subsequently to Gary Combs's farm. Bentley received telephone calls from other purported members of the conspiracy during this period. Although less than overwhelming, we believe that taken together this evidence sufficiently demonstrated the existence of a conspiracy in which both Bentley and Gary Black were involved for purposes of the admissibility of the out-of-court statements.

■ Bentley also argues that the statements made to James Black and Gary Combs were not shown to have been made in furtherance of the conspiracy. It has previously been observed that this requirement for admissibility is afforded a broad construction, *see, e.g., United States v. Harris,* 546 F.2d 234, 237–38 (8th Cir.1976); *see also United States v. Rodriguez,* 689 F.2d 516, 519 (5th Cir.1982); *United States v. James,* 510 F.2d 546, 549 (5th Cir.), *cert. denied,* 423 U.S. 855, 96 S.Ct. 105, 46 L.Ed.2d 81 (1975), and we conclude that it was satisfied in the present case with respect to the unrecorded statements attributed to Gary Black. Those statements made to James Black can fairly be said to have been made in the context of conversations designed to enlist his assistance, not only in moving the press, but also in storing

the machine and distributing tablets after their manufacture. Similarly, the unrecorded conversations related by Combs can be viewed as attempts to solicit his advice concerning the manufacture of the tablets and his assistance with the storage of the press. Thus, we are convinced these conversations may fairly be viewed as having advanced the interests of the conspiracy, insofar as they amounted to an effort to induce the listeners' aid in achieving some objectives of the illegal association.[6]

The question whether Gary Black's statements in the recorded conversations with Combs were in furtherance of the conspiracy presents a much closer question. However, even assuming these declarations were not made in furtherance of the illegal association, and were improperly admitted, we conclude that any error had no appreciable adverse effect on the jury with respect to Bentley's conviction, and was therefore harmless. *See generally United States v. Smith,* 578 F.2d 1227, 1233–34 (8th Cir.1978). The only references to Bentley included in the recorded conversations consisted of Black's statement that Bentley did not know where the press was being stored at the time it was seized and a telephone call to Bentley requesting a prescription for Black's wife. These references are not incriminating; indeed, they could be viewed

as exculpatory. In the circumstances of this case, there is not a reasonable possibility that this evidence contributed to Bentley's conviction. Consequently, any error in its admission does not require reversal. *See id.* at 1234.[7]

**B**

Bentley next asserts that the district court erred in permitting the use of transcripts of the recorded conversations. These transcripts were not introduced as evidence and were in the jury's possession only when the corresponding tapes were being played.

The decision whether to allow the use of transcripts to assist jurors in listening to a tape recording lies within the sound discretion of the district judge. *See, e.g., United States v. McMillan,* 508 F.2d 101, 105 (8th Cir.1974), *cert. denied,* 421 U.S. 916, 95 S.Ct. 1577, 43 L.Ed.2d 782 (1975). We find no abuse of discretion here. Certain portions of the recordings in question are somewhat inaudible. Moreover, the agents who prepared the transcripts testified that they listened to the tapes and accurately transcribed their contents, *see id.; see also United States v. Kirk,* 534 F.2d 1262, 1276–77 (8th Cir.1976), *cert. denied,* 433 U.S. 907, 97 S.Ct. 2971, 53 L.Ed.2d 1091

---

**6.** Bentley also contends the district court failed to make findings on the record concerning the challenged statements' admissibility, as contemplated by *United States v. Bell,* 573 F.2d 1040, 1043–45 (8th Cir.1978). The record fairly indicates that the district judge had concluded that the statements were admissible, however, and we conclude that the court's lack of full compliance with the guidelines delineated in *Bell* does not require reversal. *See United States v. Littlefield,* 594 F.2d 682, 686–87 (8th Cir.1979).

**7.** In a related argument, Bentley also contests the district court's denial of his motion for severance. Essentially, he urges that the admission of the statements attributed to codefendant Gary Black denied Bentley's sixth amendment right of confrontation, insofar as he was precluded from cross-examining Black, who did not testify. *See Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). In light of our conclusion that the testimony concerning Black's unrecorded declarations was properly admitted under Fed.R.

Evid. 801(d)(2)(E), however, this contention is without merit. *See United States v. Kelley,* 526 F.2d 615, 620–21 (8th Cir.1975), *cert. denied,* 424 U.S. 971, 96 S.Ct. 1471, 47 L.Ed.2d 739 (1976). Moreover, because any error in connection with admission of the recorded statements was harmless beyond a reasonable doubt with respect to Bentley's conviction, no reversible error results from the admission of those declarations. *See Schneble v. Florida,* 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972). In these circumstances, denial of the severance motion did not constitute an abuse of discretion.

Bentley also contends the district court erred in failing to instruct the jury that the statements attributed to Gary Black could only be considered in connection with the conspiracy count. No such cautionary instruction was requested at trial, however, and we decline to conclude that the absence of such an instruction amounted to plain error.

(1977), and Bentley has not called our attention to any inaccuracies in the transcripts. *See United States v. Gordon,* 688 F.2d 42, 44 (8th Cir.1982). Finally, the transcripts were used only to assist the jurors as they listened to the recordings, and the district judge repeatedly cautioned the jurors that the tapes were the best evidence, that the transcripts were merely an aid and that any discrepancies were to be resolved in favor of what was heard. *See Kirk,* 534 F.2d at 1276; *McMillan,* 508 F.2d at 106. In these circumstances, the decision permitting the use of the transcripts was not error.

### C

■ Bentley also contends the evidence presented at trial was insufficient to support his conviction on the conspiracy count of the indictment. In evaluating this claim, we view the evidence in the light most favorable to the government, and take as established all reasonable inferences which tend to support the jury's verdict. *See, e.g., United States v. Burchinal,* 657 F.2d 985, 991 (8th Cir.), *cert. denied,* 454 U.S. 1086, 102 S.Ct. 646, 70 L.Ed.2d 622 (1981). We are further guided by the general rule that "it is not necessary that the evidence exclude every reasonable hypothesis except that of guilt but simply that it be sufficient to convince the jury beyond a reasonable doubt that the defendant is guilty." *United States v. Cox,* 580 F.2d 317, 323 (8th Cir.1978), *cert. denied,* 439 U.S. 1075, 99 S.Ct. 851, 59 L.Ed.2d 43 (1979). The essential elements of the charge may be demonstrated by circumstantial evidence as well as direct evidence. *Id.*

■ Having examined the record with these principles in mind, we conclude that the evidence supports the jury's determination that Bentley was a member of an existing conspiracy. The previously summarized independent evidence of the illegal association, coupled with the testimony concerning the unrecorded statements attributed to Gary Black, was sufficient to support the action of the jury.

### D

In his final assignment of error, Bentley urges that the district court incorrectly denied his motion for new trial, which was based upon alleged newly discovered evidence. *See* Fed.R.Crim.P. 33. The motion focuses upon telephone records reflecting bills for Bentley's telephone service from March, 1981 through August, 1981. These records were subpoenaed from Southwestern Bell by the government prior to trial; pursuant to the prosecution's request, however, Bentley was not notified by the company of this action until after trial. He asserts that these records constitute newly discovered evidence which entitles him to a new trial. After carefully considering this claim, we conclude that the motion for new trial was properly denied.

■ As a general rule, the following requisites must be satisfied before a motion for new trial on grounds of newly discovered evidence will be granted:

(a) The evidence must be in fact, newly discovered, i.e., discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

*United States v. Frye,* 548 F.2d 765, 769 (8th Cir.1977) (footnote omitted) (*quoting Johnson v. United States,* 32 F.2d 127, 130 (8th Cir.1929)). Because the evidence in the present case was available to the prosecution and not submitted to the defense, the parties agree that Bentley need not satisfy the final criterion; that is, he need not demonstrate that the newly discovered evidence probably would have resulted in acquittal. *See United States v. Agurs,* 427 U.S. 97, 111, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1975).

■ We are satisfied, however, that the district court correctly concluded that Bentley's new trial motion should be denied. The defense received telephone logs during

pretrial discovery, and consequently was on notice that telephone calls of the alleged conspirators might be a component of the government's case. Nonetheless, no attempts were made to secure Bentley's own records.

 Nor are we persuaded by Bentley's contention that the prosecution was obligated to supply these records under the rule of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). During discovery, the defense did not specifically request that Bentley's telephone records be produced; rather, only a general request for all Brady material was made. In this situation, any constitutional duty on the part of the prosecution to volunteer this evidence is dependent upon its materiality. See Agurs, 427 U.S. at 110–13, 84 S.Ct. at 1512–13. Unless the omitted evidence, evaluated in the context of the entire record, creates a reasonable doubt as to the movant's guilt, there is no justification for a new trial. Id. at 112–13, 84 S.Ct. at 1512–13. We are not shown that the telephone records in the instant case satisfy this standard of materiality. Accordingly, the decision to deny the new trial motion will be upheld.

## IV

We next consider the separate assignments of error presented by appellant Nathan Platt. These claims arise from both pretrial suppression hearings and Platt's trial, which was conducted separately from that of Bentley and Black.

### A

After news of the DEA's investigation broke, Platt surrendered to federal authorities in Memphis, Tennessee. Shortly thereafter, on March 4, 1982, two St. Louis-based agents involved in the investigation flew to Memphis and interviewed Platt, who gave them a statement concerning his involvement in the drug manufacturing scheme. In this statement, Platt described his role in the scheme as arranging for the purchase of the tablet press and tooling, and then reselling it to Black and the others involved;

Platt himself purportedly was to receive none of the quaaludes eventually produced.

Prior to trial, Platt's attorney filed a motion seeking to suppress this statement. In the motion, Platt alleged that he had retained counsel in Memphis, that the DEA agents were aware of this situation, that they nonetheless interviewed him in the absence of the attorney, and that the statement was consequently obtained in violation of Platt's right to counsel.

Following an evidentiary hearing, a United States Magistrate recommended that the motion be denied, finding that Platt had knowingly and intelligently waived his right to counsel and voluntarily made the challenged statement. This recommendation was later adopted by the district court. On appeal, Platt urges that the suppression motion should have been granted.

 Factual findings of the trial court with respect to suppression motions will be set aside only where clearly erroneous. See, e.g., United States v. Valle, 644 F.2d 374, 375 (8th Cir.1981) (per curiam); United States v. Bear Killer, 534 F.2d 1253, 1257 (8th Cir.), cert. denied, 429 U.S. 846, 97 S.Ct. 129, 50 L.Ed.2d 118 (1976). In the present case, both DEA agents who interviewed Platt testified that he had received and understood statements of his Miranda rights, that he informed them that he was not represented by counsel and that he voluntarily gave the statement in question. This evidence, essentially uncontradicted at the suppression hearing, provides ample support for the findings adopted by the district court. We find no error in the denial of Platt's motion to suppress.

### B

Platt also contends the district court erred in restricting his cross-examination of Gary Combs, who testified on behalf of the government. When defense counsel asked Combs whether he had been indicted in a prior drug investigation, the court sustained a prosecution objection. Platt argues this limitation on cross-examination was improper. We disagree.

The Federal Rules of Evidence place certain limitations on a party's right to attack the credibility of a witness through cross-examination when such an attack is predicated upon the witness's prior conduct. *See United States v. Dennis,* 625 F.2d 782, 798 (8th Cir.1980).

Under Rule 608(b), the court in its discretion may allow impeachment of a witness by cross-examination concerning specific instances of conduct not resulting in conviction if the conduct relates to the witness's character for truthfulness or untruthfulness. The court balances a question's relevance to honesty and veracity with its prejudicial impact.... Rule 609(a) provides that in a criminal case the prior conviction of a prosecution witness may be used to impeach his credibility if it (1) was a felony and the court in its discretion determines that its probative value outweighs its prejudicial effect, or (2) involved dishonesty or false statement.

*Id.* (citations omitted).

 In the present case, no conviction resulted from the indictment in question. Consequently, its use for purposes of impeachment is not permissible under rule 609. Nonetheless, inquiry into the specific acts that may have led to the indictment would be allowed under rule 608(b) if those acts related to Combs's veracity. *See id.* We cannot say the activity in question here—a drug operation—is necessarily indicative of a lack of truthfulness under the standard imposed by rule 608. We find no abuse of discretion in the restriction of cross-examination.

**C**

In his next assignment of error, Platt contests the district court's refusal to grant his request for a mistrial. During cross-examination, while questioning Platt concerning his relationship with Dr. Bentley, the prosecutor asked whether he had "used the doctor to obtain controlled substances." [8]

On the basis of this inquiry, Platt requested a mistrial, which was denied.

 As a general rule, the decision as to whether a trial has been so tainted that a mistrial should be declared lies within the discretion of the district court. *E.g., United States v. Flemino,* 691 F.2d 1263, 1267 (8th Cir.1982) (per curiam). In the instant case, the government discontinued the challenged line of inquiry following objection by defense counsel, and on redirect examination Platt testified that he never received quaaludes from Bentley. In these circumstances, we do not consider the contested question sufficiently prejudicial to warrant reversal. The district court did not improperly exercise its discretion in denying the request for a mistrial.

**D**

Platt also asserts that the evidence presented at trial was insufficient to support his conviction on either the conspiracy or possession counts of the indictment. As indicated previously, in reviewing a claim of insufficient evidence, we view the evidence in the light most favorable to the government, and take as established all reasonable inferences which tend to support the jury's verdict. *See, e.g., United States v. Burchinal,* 657 F.2d 985, 991 (8th Cir.) *cert. denied,* 454 U.S. 1086, 102 S.Ct. 646, 70 L.Ed.2d 622 (1981).

 The evidence presented at trial indicated that Platt assisted in arranging for the purchase of the tablet press and that he selected the "Lemmon 714" tooling for the machine. Platt also took possession of the press following the purchase and subsequently delivered it to the rural property of Dr. Bentley, where it was unloaded and stored. Further, in his custodial statement, Platt admitted his role in the quaalude manufacturing conspiracy. Our review of the record convinces us that the evidence, summarized above, was sufficient to support the jury's verdict.

---

8. In an offer of proof, the government indicated that this inquiry related to three prescriptions which Platt had received from Dr. Bentley.

### E

Platt's final contention concerns the adequacy of the legal representation he received from trial counsel.[9] Asserting that he was not afforded effective legal assistance, Platt claims that as a result he was denied a fair trial.

A successful claim of ineffective assistance of counsel requires that the defendant demonstrate that his attorney failed to perform with the degree of skill and diligence with which competent counsel would perform in similar circumstances, *e.g., United States v. Easter,* 539 F.2d 663, 666 (8th Cir.1976), *cert. denied,* 434 U.S. 844, 98 S.Ct. 145, 54 L.Ed.2d 109 (1977), and that his defense was prejudiced by the attorney's incompetence. *See, e.g., Beran v. United States,* 580 F.2d 324, 326–27 (8th Cir.1978), *cert. denied,* 440 U.S. 946, 99 S.Ct. 1422, 59 L.Ed.2d 634 (1979). Counsel is presumed to have rendered effective assistance, and the defendant's burden in overcoming this presumption is a heavy one. *See, e.g., United States v. Sheehy,* 670 F.2d 798, 799 (8th Cir.1982) (per curiam). We do not believe Platt has satisfied this burden in the case at bar.

The ineffective assistance claim in the instant case centers upon Platt's custodial statement, which was utilized by the prosecution at trial. Platt initially focuses on his attorney's suppression efforts, specifically noting that although the magistrate indicated after the suppression hearing that he would permit additional evidence concerning Platt's purported Memphis attorney to be subsequently presented, no further evidence was produced. We observe in this regard, however, that we have been supplied with nothing to indicate that additional favorable evidence existed on this issue or that trial counsel failed to discover such evidence. *Cf. Harshaw v. United States,* 542 F.2d 455, 456–57 (8th Cir.1976) (per curiam) (record reflected no allegation of anything omitted pretrial investigation might have been expected to produce). Moreover, counsel clearly made an attempt to exclude the statement prior to trial: a timely suppression motion was filed, both interviewing officers were examined at length during the suppression hearing, and permission to introduce any additional favorable evidence was secured.

Platt also contends trial counsel's references to the custodial statement while cross-examining the first of the interviewing DEA agents, prior to the statement's introduction as evidence, demonstrates his ineffectiveness. At this stage of the proceeding, however, it was clear the statement would be utilized by the government; through questioning concerning the circumstances in which it was obtained, counsel may have attempted to lessen the statement's impact upon introduction and lay a basis from which to question its validity in closing argument. *Cf. United States v. Bad Cob,* 560 F.2d 877, 882 (8th Cir.1977) (counsel's failure to object to improper references to lie detector test was part of trial strategy and designed to lay foundation from which involuntariness of confession could be argued). The exercise of an attorney's professional judgment, even if later proven unwise, will not sustain a claim that the defendant was provided ineffective legal assistance. *See, e.g., United States v. Rhoads,* 617 F.2d 1313, 1319 (8th Cir.1980) (defendant not entitled, at instance of new appellate counsel, to hindsight review of tactical decisions made by trial counsel in course of trial); *Bad Cob,* 560 F.2d at 881–82.

We are not persuaded that the legal assistance Platt received from trial counsel was ineffective.

### V

As has frequently been observed, a defendant is entitled only to a fair trial, not a perfect one. *Lutwak v. United States,* 344 U.S. 604, 619, 73 S.Ct. 481, 490, 97 L.Ed. 593 (1953). After carefully reviewing the record in each of these consolidated appeals, we are satisfied that both appellants received a fair trial. Accordingly, the convictions are affirmed.

---

9. Platt is represented by a different attorney on this appeal.