**UNITED STATES of America, Appellee,**

v.

**Alexander Galund GARCIA, Appellant.**

**No. 89-1887.**

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 14, 1989.

Decided Jan. 5, 1990.

Susan Spence, Springfield, Mo., for appellant.

Michael A. Jones, Springfield, Mo., for appellee.

Before BOWMAN and BEAM, Circuit Judges, and HENLEY, Senior Circuit Judge.

BEAM, Circuit Judge.

Alexander Galund Garcia appeals from his conviction, following a jury trial, for conspiracy to import, and for importing, counterfeit money into the United States. Count one of the indictment against Alexander charged a conspiracy with Alexander's son, Dante Tarnate Garcia, to import and keep in their possession falsely made and counterfeit obligations of the United States, in violation of 18 U.S.C. § 371 (1982).[1] Count two charged the possession of specific counterfeit bills, in violation of 18 U.S.C. §§ 472 and 2 (1982). On appeal, Alexander argues that the district court erred in admitting, as statements made in furtherance of the conspiracy under Federal Rule of Evidence 801(d)(2)(E), hearsay statements made by Dante. We affirm.

## I. BACKGROUND

Alexander Garcia is a sixty-three year-old resident of the Philippines who ran an auto repair shop with his sons. His son Dante is a Philippine national who is in the U.S. Air Force, and is stationed at Clark Air Force Base in the Philippines. Both had been to the United States prior to the trip in 1988 involved in this case. Alexander had visited his daughter, Carmelita, both in Virginia and in Honolulu, where she currently lives. Alexander has a heart con-

---

1. Alexander was originally charged in a one count indictment on November 29, 1988. Following investigation by United States authorities in Hawaii, both Alexander and Dante were charged in a superseding indictment, on Decem-

ber 20, 1988. At the request of the U.S. Air Force, however, the district court dismissed the indictment as to Dante on May 31, 1989. Dante was taken into military custody and prosecuted by court-martial.

dition for which he obtained treatment when visiting Carmelita in Honolulu. Alexander had also visited his mother-in-law, Remedios Tarnate, during the time she had lived near Neosho, Missouri. Alexander visited her for several months in 1984, and Dante also stayed with her for an extended period, during which time he met and married a woman who still lives in Missouri.

In late 1988, Alexander, Dante and Remedios planned a trip to the United States. Both Alexander and Remedios were scheduled for heart treatment in Honolulu, but also intended to go to Missouri to do some Christmas shopping. Dante was to join them in Honolulu, and travel to Missouri with them, where he intended to obtain a divorce from his wife. Dante arrived first in Honolulu, where all three were to spend the night with Alexander's daughter, Carmelita. Dante arrived in the early morning, and Rolito Garcia Junio, Carmelita's son, testified at trial that Dante arrived with a suitcase and a black briefcase. Dante opened the briefcase in Rolito's presence, and he could see that it contained brown envelopes full of United States currency, in $20 and $100 bills. When Rolito left for work that morning, Dante was counting money.

When Rolito arrived home in mid-afternoon, Alexander and Remedios were there as well. The family had dinner together, and then Dante and Rolito went out. They found two prostitutes in Honolulu, took them to a hotel, and attempted to pay them with counterfeit money, which money the prostitutes refused. While in the hotel room, Dante indicated to Rolito to keep quiet about the money. Once outside in the parking lot, Dante told Rolito that the money was indeed counterfeit, and that he had brought it into the United States for his father, Alexander.

Alexander, Remedios and Dante left together the next morning for the mainland. They spent a few days in San Francisco. They then traveled to Kansas City, and to Neosho, Missouri, where Dante was to obtain a divorce, and Alexander and Remedios were to go shopping before returning to Honolulu for heart treatment. All three went to the North Park Mall in Joplin. Dante attempted to pass a counterfeit $20 bill. The store clerk refused it, and after Dante left, the clerk called mall security. A mall security guard then stopped Dante and asked him about the money. Dante denied having the bill, and said he had given it back to his father. Since Dante and the security guard could not find Alexander, Dante was released. Soon after, Alexander and Remedios were arrested at a Wal–Mart store, where Remedios had attempted to pass a counterfeit $100 bill, while Alexander waited outside. When arrested, Alexander had on his person fifty-three $100 bills and four $20 bills, all counterfeit. Any other counterfeit bills brought into the United States from the Philippines were not recovered.

## II. DISCUSSION

Alexander argues that the district court erroneously admitted several statements made by Dante, since the statements were not made "in furtherance of the conspiracy" as required by Rule 801(d)(2)(E). The first statements at issue were made by Dante to Rolito. Rolito testified that after Dante attempted to pay the prostitutes with the counterfeit money, Dante told him "that the money was not real." Trial Transcript, vol. 1, at 45. Dante also told him, in Rolito's words, that "only me, my grandpa and him knows about the money." *Id.* In addition, Dante also said that he brought the money into Honolulu for his father, that he brought it because it was easier for him, as a member of the armed forces, to get the money through customs, and that he brought $40,000 to $50,000. *Id.* at 46. The other statements at issue were made by Dante to David Lee Jones, the Joplin mall security guard. Dante simply told him that he had given the refused $20 bill to Alexander. *Id.* vol 2, at 77. Alexander argues that these statements were not made in furtherance of the conspiracy.

■ Rule 801(d)(2)(E) provides that a statement is not hearsay if it is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." This circuit has held that for a

statement to be admissible, the government must prove (1) that a conspiracy existed, (2) that the defendant and the declarant were members of the conspiracy, and (3) that the statements were made in furtherance of the conspiracy. *United States v. DeLuna,* 763 F.2d 897, 908 (8th Cir.), *cert. denied,* 474 U.S. 980, 106 S.Ct. 382, 88 L.Ed.2d 336 (1985) (citing *United States v. Bell,* 573 F.2d 1040, 1044 (8th Cir.1978)).

■ At issue here is only the "in furtherance" requirement, and it is satisfied if the statements "somehow advance the objectives of the conspiracy." *DeLuna,* 763 F.2d at 909. Thus, in *United States v. Bentley,* 706 F.2d 1498 (8th Cir.1983), *cert. denied,* 467 U.S. 1209, 104 S.Ct. 2397, 81 L.Ed.2d 354 (1984), we held that statements designed to enlist a third party's assistance were in furtherance of the conspiracy. *Id.* at 1506–07. It was sufficient that the statements were made in "an effort to induce the listener's aid in achieving some objectives" of the conspiracy. *Id.* at 1507. Similarly, in *United States v. Handy,* 668 F.2d 407 (8th Cir.1982), we held that "[s]tatements of a coconspirator identifying a fellow conspirator are considered to be in furtherance of the conspiracy." *Id.* at 408.

Alexander argues that the statements admitted were not in furtherance of the conspiracy, but were mere conversation, or simple, narrative statements which in no way advanced the objectives of the conspiracy. *See, e.g., DeLuna,* 763 F.2d at 909 (statements which "merely inform the listener ... of the declarant's activities" are not in furtherance); *United States v. Snider,* 720 F.2d 985, 992 (8th Cir.1983), *cert. denied,* 465 U.S. 1107, 104 S.Ct. 1613, 80 L.Ed.2d 142 (1984) (statements merely describing a marijuana-growing operation were meant to impress the listener, but not to advance the objects of the conspiracy); *United States v. Green,* 600 F.2d 154, 158 (8th Cir.1979) (distinguishing statements found to be "casual comments which were neither intended to further, nor had the effect of furthering the conspiracy in any way.").

We conclude that the statements at issue in this case were not casual comments or mere conversation. The "in furtherance" language of Rule 801(d)(2)(E) is to be read broadly, *Bentley,* 706 F.2d at 1506, and here the statements advanced the objects of the conspiracy. The statements made by Dante to the mall security guard were necessary to delay or prevent Dante's arrest, and thus to allow the conspiracy to continue. The statements to Rolito were in furtherance because they identified a fellow conspirator, *see Handy,* 668 F.2d at 408, and also because they revealed the existence and progress of the conspiracy. *Id.* Moreover, the statements made to Rolito could be construed as meant to enlist Rolito's assistance by not unintentionally revealing the existence of the conspiracy. *See Bentley,* 706 F.2d at 1506. While still in the Honolulu hotel room, Dante signaled to Rolito to be quiet, and then made the statement at issue, explaining his actions. The statement was meant to keep Rolito quiet by revealing to him the conspiracy. Therefore, we find no error in the district court's rulings.

We also note that even if the statements were not in furtherance of the conspiracy, the evidence against Alexander was so compelling that the admission of these statements was harmless error. *See Snider,* 720 F.2d at 993; *Green,* 600 F.2d at 158.

## III. CONCLUSION

We have considered Alexander's other arguments on appeal and find them to be without merit. For the reasons stated, we affirm the judgment of the district court.