MILTON A. FRIED, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Fried v. Commissioner
Docket Nos. 3533-83; 1454-85; 1455-85; 15390-85
United States Tax Court
T.C. Memo 1989-430; 1989 Tax Ct. Memo LEXIS 428; 57 T.C.M. (CCH) 1300; T.C.M. (RIA) 89430; August 15, 1989
David Berman and Jan Neiman, for the petitioners. Bonnie Rosner, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: This case was heard by Special Trial Judge Peter J. Panuthos pursuant to the provisions of section 7443A of the Code. [2] The Court agrees with and adoptsy *430 the Special Trial Judge's opinion, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE PANUTHOS, Special Trial Judge: Respondent determined deficiencies in and additions to the Federal income tax of Milton A. Fried (hereinafter petitioner) and his wife, Glenn Fried, [3] as follows: Addition to Tax
Sec. 6653(b),
Year
Deficiency
I.R.C. 1954
1973
$  19,380.50
$  9,690.25
1974
$  79,434.00
$ 39,717.00
1975
$  97,247.00
$ 48,623.00
1976
$ 131,500.05
$ 65,750.03
1977
$  41,211.15
$ 20,605.63
1981
$  46,837.76
--         *431 Petitioner has conceded the deficiencies in tax for the years in question except as set forth below. After concessions by both parties, the issues remaining for decision are: (1) Whether petitioner is entitled to claim a deduction related to his investment in a movie partnership called Nap Properties, Ltd. for 1973. (2) Whether capital was a material income-producing factor in the business conducted by petitioner's partnership during taxable years 1974 and 1975 so as to limit to 30 percent the percentage of income from the partnership subject to the 50-percent maximum tax rate on personal service income provided in section 1348; (3) Whether petitioner is liable for the additions to tax under section 6653(b) for 1973, 1974, 1975, 1976, and 1977; and (4) Whether assessment of the tax for the years 1973 and 1977 is barred by the statute of limitations. FINDINGS OF FACT At the time the petitions were filed in these cases, petitioners resided in Miami Beach, Florida. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner began promoting tax shelters in 1974. From 1974 through 1976, petitioner's major source of income *432 was the tax shelter promotion business. Petitioner reported income from a partnership formed by him and Marvin Popkin (the Popkin-Fried partnership) on Schedules C attached to his Forms 1040 for his taxable years 1974 and 1975. The Popkin-Fried partnership received fees for services performed by its partners in promoting various limited partnerships, specifically, selling partnership interests in the other partnerships. Although Popkin-Fried held interests in some of the partnerships it promoted, Popkin-Fried did not maintain an "inventory" of partnership interests that it sold on its own account. Petitioner, individually and through Popkin-Fried, promoted and participated in movie and coal shelters during the years in issue, and we address these two categories separately. Movies
In 1973, petitioner invested in a movie limited partnership called Nap Properties, Ltd. Petitioner's involvement in that venture was strictly as an investor. On his 1973 Federal income tax return, petitioner deducted $ 27,818 as his distributive share of the loss incurred by Nap Properties, Ltd. for its taxable year 1973. Petitioner substantiated his investment in NAP properties to the extent *433 of $ 9,000 paid by check in February 1974. From 1974 through 1980, petitioner and Popkin purchased movies through limited partnership vehicles and sold limited partnership interests to investors. Petitioner promoted and was the general partner, directly or indirectly, [4] of the following movie ventures: 1. Lakeview Properties, Ltd. 2. Parkview Properties, Ltd. 3. Islandview Properties, Ltd. 4. Oceanview Properties, Ltd. 5. Dorian Properties, Ltd.
6. River Properties, Ltd. 7. Wolf Properties, Ltd. 8. Sea Properties, Ltd. 9. Bijoux Properties, Ltd. The purchase price of each of the movies was financed largely (over 80 percent) with nonrecourse notes. All of the partnerships showed substantial losses on their partnership returns. The partners claimed the losses on their individual tax returns and claimed investment tax credits based on the purchase price of the movies. The partnerships had nominal amounts of gross income. Although the partnerships apparently obtained appraisals of the movies in which they invested, the appraisals *434 were not relied on by the partnerships for investment purposes. Rather, the appraisals were after-the-fact estimates for the purpose of supporting tax deductions, since they are dated after the movie partnerships were formed. Well-known actors and actresses, however, starred in the movies, and even respondent's expert conceded that two appraisals of one of the films varying by 500 percent could be considered "accurate." Coal
In late 1976, petitioner and Popkin began promoting coal mining tax shelters. The coal ventures were undertaken to salvage two movie partnerships adversely affected by the Tax Reform Act of 1976. Petitioner had no experience in the coal business. Petitioner promoted and was a general partner of Mountainview Properties, Ltd., one of the two movie partnerships he and Popkin sought to salvage with coal investments. On October 29, 1976, Popkin, as president of Financial Advisory Group, Inc. (his wholly owned corporation), executed a lease to a coal-bearing tract of land in Kentucky known as the Bodenheimer tract. The lessor of the property was Cannel Log, Inc., a corporation of which Walter Childers was president. Although the lease was not executed *435 by Childers before October 30, 1976, the lease was dated October 26, 1976. Petitioner notarized, on a separate sheet attached to the lease, Popkin's signature dated October 26, 1976. This lease provided that Cannel Log, Inc., would receive $ 50,000 cash as an advance royalty payment on or before December 31, 1976. Financial Advisory Group, Inc. in turn executed a lease on the Bodenheimer tract with Mountpine Properties, a partnership comprising Alpine Properties, Ltd., Mountainview Properties, Ltd., and the Popkin-Fried partnership. Under the terms of this lease, the three entities were to pay Financial Advisory Group the sum of $ 3,000,000 as an advance royalty as follows: $ 50,000 in cash and a $ 2,950,000 nonrecourse promissory note to be secured by "a pledge of this lease." Petitioner signed this lease as general partner of Mountainview Properties. The lease between Financial Advisory Group and Cannel Log was not complete when executed by Childers (i.e., he executed the document in blank) and was backdated. No mining ever took place, or was attempted, on the Bodenheimer tract. Mining was never commenced because the necessary funds were not provided to Childers' firm, which *436 had contracted to conduct the operation. On October 29, 1976, the Internal Revenue Service issued News Release IR-1687. The release announced a proposed amendment to the regulations providing that advanced royalties could be deducted only in the year that a mineral product is sold. The amendment was effective October 29, 1976, unless the royalties were paid pursuant to a lease or written contract binding prior to that date. Petitioner requested that tax attorney Ben Schwartz prepare a tax opinion in connection with the Bodenheimer coal investment for inclusion in the Mountainview Properties, Ltd., and Alpine Properties, Ltd., movie promotions. The information relied upon by Schwartz in preparing the opinion came solely from petitioner and Popkin. Had attorney Schwartz been aware of the backdated lease, he would have issued a different tax opinion with regard to the Bodenheimer tract venture. Mountpine Properties' partnership return for 1976 reflected a deduction for the entire advance royalty of $ 3,000,000. The partnership's return for 1977 showed interest expense of $ 177,000 on the promissory note and $ 5,000 in royalty deductions. Petitioner claimed his distributive *437 share of the losses of Mountpine Properties, Ltd., on his 1976 and 1977 Federal income tax returns by virtue of his interests in the Popkin-Fried partnership, Mountainview Properties, Ltd., and Alpine Properties, Ltd. Petitioner carried back portions of the losses to his taxable years 1973, 1974, and 1975, [5] and carried portions of the losses forward to his taxable years 1977 and 1978. These deductions resulted in underpayments of tax for petitioner's 1976 and 1977 taxable years. Realty Marketing Group, Inc. (Realty), one of Popkin's wholly owned corporations, was the general partner of another coal promotion known as Arnett Mining Co., Ltd. (Arnett). Petitioner was a limited partner in Arnett. Petitioner invested in Arnett with a recourse note of $ 37,500. Arnett conducted no mining operations on the property it leased, and petitioner never made any payment on that note. Nevertheless, on his 1976, 1977, and 1978 Federal income tax returns, petitioner claimed his distributive share of partnership loss from Arnett in the amounts of $ 141,659, $ 7,647, and $ 7,697, respectively. OPINION Admissibility *438 of Helen Popkin's Testimony
Helen Popkin, wife of Marvin Popkin, testified at trial as to statements made by her husband concerning his and petitioner's tax shelter promotion activities. Petitioner objected to her testimony on the ground that it was hearsay. Helen Popkin's testimony was admitted subject to petitioner's objection, and the parties presented argument on this issue in their briefs. Respondent contends that the statements by Popkin to his wife were not hearsay under Rule 801(d)(1)(A), Federal Rules of Evidence, and, alternatively, that her testimony is admissible under the exception to the hearsay rule for statements by co-conspirators. Rule 801(d)(2)(E), Federal Rules of Evidence. We reject respondent's contentions regarding Mrs. Popkin's testimony and have not considered her testimony in reaching our decision in this case. It is incorrect to assert that Mrs. Popkin's testimony was not hearsay under Rule 801(d)(1)(A), Federal Rules of Evidence. That rule permits introduction of the prior inconsistent statement of a witness as substantive evidence only if the *439 prior statement was made under oath. While Mr. Popkin appeared as a witness in this case, his out-of-court statements to his wife were not made under oath. Accordingly, Mrs. Popkin's testimony concerning Mr. Popkin's statements is hearsay. As hearsay, Mrs. Popkin's testimony is inadmissible unless it falls under an exception to the hearsay rule. Under Rule 801(d)(2)(E), Federal Rules of Evidence, a statement made by a co-conspirator during the course and in furtherance of a conspiracy is admissible. Respondent cited several cases standing for the proposition that the "in furtherance of the conspiracy" requirement of the rule should be interpreted broadly. See, e.g., United States v. Bentley, 706 F.2d 1498 (8th Cir. 1983); United States v. Rodriguez, 689 F.2d 516 (5th Cir. 1982); United States v. McGuire, 608 F.2d 1028 (5th Cir. 1979). Respondent has failed, however, to show how Mr. Popkin's statements to his wife were in furtherance of a conspiracy between Popkin and petitioner, even assuming for the sake of argument that such a conspiracy existed. The statements allegedly made by Mr. Popkin *440 to Mrs. Popkin can in no way be construed as an attempt by him to further a conspiracy, or even to enlist his wife as a co-conspirator. We hold, therefore, that Mrs. Popkin's testimony was inadmissible. Deduction Related to Petitioner's Investment in Nap Properties, Ltd.
Petitioner concedes that the deduction in 1973 of his distributive share of the loss of Nap Properties, Ltd., is not allowable. He nevertheless argues that he should be allowed to deduct the loss to the extent of his actual investment in the limited partnership, as were other limited partners who settled their cases with respondent. In the alternative, he maintains that he is entitled to a deduction for a theft loss under section 165(c)(3) in the amount of his investment, since the promoters of Nap Properties, Ltd., were convicted of fraud. [6]
Petitioner's averments on brief are not supported by the record. No evidence was presented relating to the settlement of cases, including petitioner's, involving Nap Properties, Ltd. In any event, petitioner would not necessarily be entitled to the same settlement *441 terms as other investors in Nap Properties, Ltd. See Nicklo v. Commissioner, T.C. Memo. 1988-235; Avers v. Commissioner, T.C. Memo. 1988-176. Neither was evidence relating to any theft or embezzlement loss presented by petitioner. Petitioner has therefore failed to carry his burden of proving entitlement to a theft loss deduction. See Marine v. Commissioner, 92 T.C. 958, 978-980 (1989); Viehwig v. Commissioner, 90 T.C. 1248, 1254 (1988); Horn v. Commissioner, 90 T.C. 908, 940 (1988). Accordingly, we sustain the deficiency for 1973 determined by respondent with regard to the deduction of petitioner's share of the loss of Nap Properties, Ltd. 50-Percent Maximum Rate on Earned Income
Former section 1348[7] provided a maximum tax rate of 50 percent on "earned income." Under old section 1348(b), "earned income" means any income which is earned income within the meaning of section 401(c)(2)(C) or section 911(b), with certain exceptions not relevant here. Section 911(b) defines *442 earned income as wages, salaries, professional fees, and other amounts received as compensation for personal services actually rendered. Section 911(b) further provides: In the case of a taxpayer engaged in a trade or business in which both personal services and capital are material income-producing factors, under regulations prescribed by the Secretary or his delegate, a reasonable allowance as compensation for the personal services rendered by the taxpayer, not in excess of 30 percent of his share of the net profits of such trade or business, shall be considered as earned income. Under section 1.1348-3(a)(3)(i), Income Tax Regs., if both personal services and capital are material income-producing factors, not more than 30 percent of the net profits a taxpayer receives from his business (including guaranteed payments under section 707(c) received from a partnership) can be considered "earned income" for purposes of the maximum tax provisions of former section 1348. Respondent argues that the income petitioner received from the Popkin-Fried partnership during 1974 and 1975 was derived from the sale of tax shelter packages and not from fees for personal services performed *443 by petitioner. Accordingly, respondent argues, no more than 30 percent of the income received by petitioner from Popkin-Fried was earned income qualifying for the 50-percent maximum rate, since the income was derived from the sale of products, not services, to investors for a fee. Petitioner maintains that capital was not a material income-producing factor in the movie promotion business. Rather, petitioner argues, all amounts received were for services provided by petitioner or his partner on behalf of Popkin-Fried to the various movie partnerships. We agree with petitioner. Whether capital is a material income-producing factor in a business is determined by reference to all the facts in a case. Sec. 1.1348-3(a)(ii), Income Tax Regs. Capital is not a material income-producing factor where the activity generating the income is essentially personal services. Bruno v. Commissioner, 71 T.C. 191, 200-201 (1978). The Popkin-Fried partnership and its partners were engaged in the business of promoting tax-sheltered investments. Fees were received from the partnerships in exchange for promotional and sales services rendered by the partners of Popkin-Fried. Accordingly, *444 capital was not a material income-producing factor in the business of the partnership. See Bruno v. Commissioner, supra; Crowell v. Commissioner, T.C. Memo. 1988-305. In Crowell, respondent argued that capital was a material income- producing factor in the business of a partnership which conducted a securities brokerage business. We rejected that argument, finding that the partners were paid for services rendered in arranging sales and purchases of securities. The brokerage partnership, the Court observed, maintained no "inventory" of securities that it sold to clients, even though the brokerage maintained small accounts on its own behalf. Similarly, the tax shelter packages sold by Popkin-Fried were neither "inventory" nor capital investments of Popkin-Fried. Petitioner's partnership income for 1974 and 1975 therefore qualifies for the 50-percent maximum rate on earned income provided for in section 1348. Additions to Tax for Fraud
The 50-percent addition to tax in the case of fraud is a civil sanction provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of *445 investigation and the loss resulting from the taxpayer's fraud. Helvering v. Mitchell, 303 U.S. 391, 401 (1938). Respondent has the burden of proving, by clear and convincing evidence, that for each year, there was an underpayment of tax, and that some part of the underpayment was due to fraud. Sec. 7454(a); Rule 142(b). This burden is met if it is shown that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud will never be presumed. Beaver v. Commissioner, 55 T.C. 85, 92 (1970). Fraud may, however, be proved by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. The taxpayer's entire course of conduct may establish *446 the requisite intent. Stone v. Commissioner, 56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner, 53 T.C. 96, 105-106 (1969). A fraudulent understatement of income can be accomplished by an overstatement of deductions. Drobny v. Commissioner, 86 T.C. 1326 (1986); Professional Services v. Commissioner, 79 T.C. 888 (1982); Hicks Co. v. Commissioner, 56 T.C. 982 (1971), affd. 470 F.2d 87 (1st Cir. 1972); Neaderland v. Commissioner, 52 T.C. 532 (1969), affd. 424 F.2d 639 (2d Cir. 1970). We must decide whether the losses reflected on petitioner's 1973 through 1977 returns attributable to the tax shelter activities were claimed with the willful intent to evade tax. Respondent relies on circumstantial evidence to prove petitioner's fraudulent intent. In this regard, respondent argues that petitioner engaged in a systematic scheme employing illusory nonrecourse notes to maximize mythical losses against earned and taxable income. Respondent has attempted to show one indicium of fraud by proving a pattern of understating income. *447 Respondent contends that investment in a series of tax shelters, all of which produce tax losses, is per se fraudulent. We do not accept respondent's argument. See Popkin v. Commissioner, T.C. Memo. 1988-459. Respondent, by concession, has proven an understatement of income for each of the years 1973 through 1977. Popkin v. Commissioner, supra.Understating income is one indicium of fraud. Bradford v. Commissioner, 796 F.2d 303 (9th Cir. 1986), affg. a Memorandum Opinion of this Court; Archer v. Commissioner, 227 F.2d 270 (5th Cir. 1955), affg. a Memorandum Opinion of this Court. We discuss the other indicia of fraud separately as they relate to petitioner's movie and coal activities. Movies
Petitioner claimed losses with respect to a number of movie shelters from 1973 to 1977. Respondent contends that because the movies were purchased with nonrecourse financing, because petitioner obtained inflated appraisals, and because the movies did not show a profit, the deals were without substance or profit objective. These are relevant factors, see, e.g., *448 Soriano v. Commissioner, 90 T.C. 44 (1988), and Beck v. Commissioner, 85 T.C. 557 (1985), but we are not convinced that petitioner's activities with respect to the movie shelters were fraudulent. Petitioner's participation in Nap Properties, Ltd., was strictly as an investor, and respondent has failed to demonstrate that the underpayment of tax resulting from petitioner's deduction in 1973 of his distributive share of the loss of Nap Properties, Ltd., was attributable to fraud. Well-known actors starred in the movies promoted by petitioner in subsequent years. Although estimates of the films' value were inflated and apparently obtained after the deals were entered into, respondent's expert admitted that the valuation of a movie is highly subjective. Even though we have found that understatements of income resulted from petitioner's movie promotions, the evidence presented relating to the movie tax shelters does not prove fraud. Accordingly, we do not sustain the additions to tax for fraud for petitioner's taxable years 1973 through 1975. Coal
Respondent has proved fraud, however, with respect to petitioner's coal shelter activities in *449 1976 and 1977. Although petitioner was fully aware that he had never made a payment on the note given for his investment in the Arnett Mining coal shelter and would not be required to do so, he nevertheless claimed his distributive share of losses from the venture on his 1976, 1977, and 1978 Federal income tax returns. In addition to establishing an underpayment, this is also substantial evidence of fraud. The most telling indicia of fraud relate to the Bodenheimer tract. The lease between Cannel Log and Financial Advisory Group could not have been executed prior to October 29, 1976. Accordingly, no advance royalty deduction was available. Sec. 1.612-3(b)(3), Income Tax Regs. Petitioner, however, purported to notarize the signature on the lease of his partner, Popkin, on October 26, 1976. He thus was a party to the backdating of the lease in order to qualify for the advance royalty deduction. Manipulation of records to mislead or conceal is another indicium of an intent to evade tax. Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986). No attempt was made at trial to explain the apparent backdating of the lease, and we thus conclude that no explanation *450 favorable to petitioner exists. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Although petitioner argues that he relied on the advice of tax counsel in taking the deductions to negate the inference of fraudulent intent, he did not provide all material facts relating to the transactions to his advisers. Among other things, he did not inform them that the promissory note he gave for his investment in Arnett was illusory, and that the Bodenheimer lease was backdated. Accordingly, petitioner cannot negate the attribution to him of fraudulent intent. United States v. Drape, 668 F.2d 22 (1st Cir. 1982); United States v. Jett, 352 F.2d 179 (6th Cir. 1965). Based on all the evidence in the record in this case, we find that respondent has shown by clear and convincing evidence that a part of the understatements in petitioner's Federal income tax liability for 1976 and 1977 is attributable to fraud. As in Popkin v. Commissioner, T.C. Memo. 1988-459, we stress that our holding is not based on mere promotion of "tax shelters." We have found actual, *451 intentional wrongdoing by petitioner in his participation in the backdating of the Bodenheimer lease and his claiming losses on his return based upon information he knew to be incorrect. It is on this that we largely rely in determining that the underpayments were due to fraud. We also conclude that petitioner has been disingenuous in attempting to portray himself as a tyro in the investment field who invested, on the advice of tax and other "advisers," in a series of deals which never yielded a profit, but, coincidentally, produced enormous tax benefits and large sums of money for petitioner as their promoter. Petitioner was an experienced attorney, albeit not a tax lawyer, with more than a passing familiarity with 22 the Internal Revenue Code. As a promoter, he had considerable experience with tax shelters, and we reject his depiction of himself as simply an unlucky investor. Period of Limitations for Taxable Years 1973 and 1977
Petitioner raised the statute of limitations as a defense to the deficiencies determined for 1973 and 1977. We have found that the underpayment for 1977 was attributable in part to fraud, and thus the normal 3-year statute of limitations is not *452 a bar to assessment of the tax for that year. Sec. 6501(c). Meier v. Commissioner, 91 T.C. 273, 303 (1988). We have held, however, that the deficiency determined by respondent for petitioner's taxable year 1973 did not involve fraud. Respondent relies on a series of Forms 872 executed by petitioner extending the period of limitations on assessment for petitioner's taxable year 1973. The consents are expressly limited to adjustments or corrections to petitioner's distributive share of partnership items of Nap Properties, Ltd. Petitioner argues on brief that the consents were obtained from him under false pretenses and are thus invalid. Specifically, he maintains that respondent represented that additional time was needed to determine the merits of the claimed deductions, when in fact respondent's investigation of Nap Properties, Ltd., was complete, and respondent simply "did not want the civil aspects of the case to interfere with the criminal case." It is unnecessary for us to consider the merits of this argument, since there is no evidence in the record to support it. Accordingly, we find that the period of limitations on assessment for petitioner's taxable *453 year 1973, with respect to items related to petitioner's investment in Nap Properties, Ltd., remains open. To reflect the foregoing and concessions by the parties, Decisions will be entered under Rule 155. Footnotes
1. The following cases are consolidated herewith: Milton A. Fried and Glenn C. Fried, docket No. 1454-85; Milton A. Fried, docket No. 1455-85; and Milton A. Fried and Glenn C. Fried, docket No. 15390-85.↩
2. This case was assigned pursuant to section 7443A and Rule 180. All section references are to the Internal Revenue Code, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. Notices of deficiency were issued to Milton Fried and Glenn Fried jointly for their tax years 1973 through 1975 and 1981. For tax years 1976 and 1977, notices of deficiency were issued only to Milton Fried. Petitioner Glenn Fried and respondent stipulated to her correct tax liability for 1973, 1974, 1975, and 1981 in stipulations filed with the Court on May 9, 1988.↩
4. The general partner of these ventures was usually the Popkin-Fried partnership or the Popkin-Fried-Rolnick partnership.↩
5. Petitioner filed amended Federal income tax returns for these years.↩
6. The promoters of Nap Properties, Ltd., were convicted of crimes relating to tax↩ fraud.
7. Repealed by Pub. L. 97-34, the Economic Recovery Tax Act of 1981 (ERTA), for tax years beginning after 1981.↩