Michael BISNETT, Petitioner,

v.

Walter KELLY, Superintendent, Attica Correctional Facility, and Glenn Goord, Commissioner, New York State Department of Correctional Services, Respondents.

No. 97 CV 2127(RR).

United States District Court,

E.D. New York.

July 8, 2002.

Law Office of Ronald L. Kuby, New York, By Ronald L. Kuby, Esq., Eve S. Rosahn, Esq., for Petitioner.

Honorable Charles J. Hynes, Kings County District Attorney, Brooklyn, By Thomas Burka, Assistant District Attorney, Andrew Leff, Assistant District Attorney, for Respondents.

### Memorandum and ORDER

RAGGI, District Judge.

Michael Bisnett petitions this court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (1994 & Supp.2001). Bisnett was convicted in 1986 after a jury trial in Kings County of Criminal Sale of a Controlled Substance in the First Degree, *see* N.Y. Penal Law § 220.43[1] (McKinney 2000), Criminal Possession of a Controlled Substance in the First Degree, *see* N.Y. Penal Law § 220.21[1] (McKinney 2000), and Criminal Possession of a Weapon in the Third Degree, *see* N.Y. Penal Law § 265.02[4] (McKinney 2000). He is presently incarcerated serving concurrent terms of twenty-three years to life for the sale and possession of a controlled substance, and two and one-third to seven years for weapon possession. In challenging his conviction before this court, Bisnett asserts that he was denied (1) due process of law when the trial court erroneously found him competent to stand trial, and (2) his Sixth Amendment right to the effective assistance of trial counsel. Having carefully reviewed the submissions of the parties as well as the record of proceedings in the state courts, the court concludes that Bisnett's petition must be denied as without merit.

### Factual Background

1. *The Charged Cocaine Operation*

For at least six months prior to September 1984, petitioner Michael Bisnett and co-defendant Alonzo Wilson operated a cocaine network out of various Brooklyn locations, including Bisnett's shop, Liberty Locksmith, at 2135 Caton Avenue. Working with them were Frank Solomon and Herbert Reid, both of whom would eventu-

ally plead guilty to selling drugs and testify against their bosses.

### a. *The Bribery of New York City Police Officers*

Much of the evidence against Bisnett and Wilson was developed by Police Lieutenant Willis Krebs and Sergeant Raul Valles, who posed as corrupt officials willing to shield defendants' drug operation in return for bribes. At trial, Lt. Krebs testified that starting on June 13, 1984, and continuing for several weeks thereafter, he received cash payments from Frank Solomon in return for "protecting" certain locations on Caton Avenue from police investigation.

To advance the investigation, police executed search warrants at 2160 and 2164 Caton Avenue in late July, seizing drugs and money at each location. Then, on August 1, 1984, Lt. Krebs attempted to speak with one of the suspected leaders of the Caton Avenue operation, Alonzo Wilson, by stopping him for a traffic violation. During this encounter, Wilson told Krebs that he knew the officer had been paid to protect the drug organization. Krebs replied that the failure to make a recent payment had prompted the July searches. Wilson proposed a meeting to discuss future payments and told Krebs that he could be reached through Bisnett at Liberty Locksmith. A few days later, Krebs saw Wilson and Bisnett together on Caton Avenue.

When Krebs, Valles, and Wilson sat down for a meeting, Wilson identified himself as the street manager of the Caton Avenue drug operation and indicated that he was authorized to accept any reasonable payment demand. On a napkin, Krebs wrote that he wanted $15,000 in cash and four ounces of cocaine. He then asked Wilson to identify the particular places he wanted shielded from police investigation. Wilson named 2160 and 2164 Caton Avenue and 2025 Regent Place. He also requested that the police "stop bothering" the people at Liberty Locksmith, noting that Bisnett had had to rent office space at 2128 Caton Avenue because the area around the locksmith shop had become too "hot" for organization meetings. Wilson also asked the police to eliminate a drug competitor working on Parkside Avenue.

A short time later, Krebs received a telephone call from Herbert Reid who represented himself as a ranking member of the Caton Avenue operation. Reid advised Krebs that the first week's bribe payment would be "ten [thousand dollars] and two [ounces of cocaine]," to be followed in future weeks by the demanded $15,000 and four ounces of cocaine. When, in fact, the second week's payment was not made, police executed search warrants at 2025 Regent Place, as well as 2060 and 2164 Caton Avenue.

Almost immediately after these searches, Krebs and Valles went to 2128 Caton Avenue where they found Bisnett and Solomon on the second floor. When the officers asked to speak to Bisnett, petitioner expressed concern that they might be wearing recording devices. Once satisfied that the officers were not recording the conversation, Bisnett boasted that the police could not charge him with anything more serious than conspiracy. Bisnett then proceeded to complain of the recent searches, stating that he knew police had recovered machine guns, revolvers, and a shotgun at one location. He also said he knew Krebs had received a recent protection payment of $10,000 cash and two ounces of cocaine, but that the organization was growing skeptical of the officers' reliability. When Krebs asked to discuss future protection with someone in authority, Bisnett replied that the "main

man" would contact Krebs the following week.

On September 4, 1984, Reid called Krebs, prompting Krebs to call Bisnett. Bisnett assured Krebs that he could trust Reid. The following day, Reid met with the officer and represented himself as the organization's "boss," while dismissing Bisnett as a "white patsy." He reiterated the need for protection of drug operations at 2160 and 2164 Caton Avenue. Pointing to a blue shoulder bag that he had carried into the meeting, Reid advised Krebs that the demanded $15,000 and four ounces of cocaine were inside.

Reid missed the following week's payment appointment. Instead, Bisnett telephoned Krebs to advise him that Reid had been arrested on unrelated charges and to request his release. Krebs and Valles secured Reid's release and drove him to the site where the week's bribe payment was stored. Instead of completing this transaction, however, they placed Reid under arrest for his involvement in the Caton Avenue operation. Police then executed search warrants on eleven of the operation's locations, seizing cocaine, firearms, drug paraphernalia, and cash.

### b. *Reid's and Solomon's Testimony*

In their trial testimony, Reid and Solomon provided detailed evidence of the workings of the Caton Avenue operation. Reid explained that in April 1984, Wilson hired him to carry messages between himself and Bisnett at Liberty Locksmith, as well as other confederates who processed drugs at 2164 Caton Avenue. He would pick up the cocaine to be processed from Bisnett at the shop and return there to deliver the money made from drug sales. Within a few weeks, Reid was placed in charge of the 2164 location.

Frank Solomon testified that in April 1984, Wilson hired him as a "steerer" to direct customers to apartments where the organization was selling cocaine. Solomon stated that when, in the spring of 1984, it was decided to bribe police officers to prevent raids on these apartments, he volunteered to carry the money. On June 13, 1984, he went to Bisnett's shop where petitioner gave him a sum of money and instructed him regarding its delivery. Over the next several weeks, Solomon continued to deliver bribe payments to Lt. Krebs and Sgt. Valles. When the officers asked for partial payment in cocaine, Solomon reported this to Bisnett, who agreed.

Thereafter, Wilson also interacted briefly with the officers, but in July 1984, when Krebs demanded a $15,000 payment, Bisnett decided that Reid would be put forward in the role of a ranking member of the organization. As Reid explained at trial, Bisnett instructed him to tell Krebs that the first week's payment would be "ten and two" left in a grocery bag at a particular site. From Bisnett's office at 2128 Caton Avenue, Reid and Bisnett watched the officers pick up this payment. Reid again followed Bisnett's instructions when on September 4, 1984, he represented himself to Krebs as the organization's boss, a role that in fact belonged to Bisnett. The following day, Reid paid Krebs $15,000 in cash and four ounces of cocaine supplied by Bisnett.

### 2. *Bisnett's Sleep Apnea*

In seeking a writ of habeas corpus, Bisnett asserts that he was incompetent to stand trial because he suffered from sleep apnea, a condition in which breathing stops during sleep causing frequent awakenings that deprive the person of adequate rest. The trial court rejected this claim after an evidentiary hearing. Thus, a brief discussion of the state court record is necessary for federal review.

a. *Initial Disclosure of Bisnett's Apnea Condition to the Trial Court*

Bisnett was first diagnosed with and treated for sleep apnea in 1982. Nevertheless, from 1984, when criminal charges were filed against Bisnett, until early 1986, when pre-trial suppression hearings commenced, petitioner's retained attorneys, Bruce Cutler and Richard Medina, were apparently unaware of this condition. Not until January 6, 1986, when defense counsel failed to secure a severance for Bisnett on the ground of prejudicial spillover evidence, did Mr. Cutler inform the court that he might file another severance motion based on Bisnett's medical incapacity. *See* Trial Tr. at 87.[1]

Petitioner's attorney did not file the motion for several weeks. For a brief time, the parties actively explored the possibility of Bisnett pleading guilty. Indeed, the court conducted a plea allocution but, on January 9, 1986, Mr. Cutler reported that after "extensive consultation," Bisnett had decided to stand trial. *See id.* at 350–51. That same day, counsel moved orally for a medical severance arguing—in seeming contradiction of the earlier reference to an "extensive consultation"—that Bisnett "falls asleep at the drop of a hat [and] . . . when he is awake he speaks so quickly . . . [that] I can't understand him." *Id.* at 352. When the court noted that it had had no problem understanding Bisnett during his attempted allocution, counsel proffered a letter from two doctors, dated November 7, 1985, confirming Bisnett's debilitating condition. *See id.* at 353. The court observed that the letter only identified the condition; it did not express any opinion as to Bisnett's ability to stand trial. *See*

*id.* at 354. Accordingly, it denied the oral severance motion with "leave to renew upon a properly substantiated affidavit from a recognized physician." *Id.*

Still later on January 9, 1986, Mr. Cutler advised the court that the defense was considering waiving a jury trial because of its continued concern about prejudicial spillover of evidence. When the court asked Bisnett if he had heard his attorney's discussion of a waiver, Bisnett answered, "Yes." *Id.* at 382. But when the court asked Bisnett if he had discussed the matter with counsel, Mr. Cutler interjected, "He was asleep again." *Id.* The court stated, "I want to wake him up now. Did you hear what your lawyer just said?" *Id.* Bisnett acknowledged that he had and did not complain of any gap in comprehension caused by his condition.

Toward the end of proceedings on January 9, 1986, the court observed Bisnett sleeping and ordered him to awaken. *See id.* at 433. The court then stated that it would explore with counsel acceptable procedures to deal with Bisnett's condition at trial. Inviting the defense to supply medical opinion on the issue, the court meanwhile directed Bisnett to sit directly next to his attorney during pre-trial proceedings, presumably so that counsel could guard against any dozing. *See id.* at 434.

When suppression proceedings resumed on January 13, 1986, Mr. Medina advised the court that Bisnett had napped for 45 minutes during the lunch recess, *see id.* at 471, but thereafter made no further mention of petitioner sleeping on that day. On January 14, 1986, during consideration of a co-defendant's suppression motion, Mr.

---

1. On January 6, 1986, Mr. Cutler stated that he had known of the apnea problem for approximately one month. *See id.* Subsequently, however, when Mr. Medina filed a formal *affidavit* in support of severance, he stated that defense counsel were first advised of the apnea on January 5, 1986. *See* Resp't. App. at A14, *People v. Bisnett*, 144 A.D.2d 567, 534 N.Y.S.2d 424 (2d Dep't 1988). Since the affidavit was sworn and since Bisnett has never contradicted it, this court assumes its accuracy.

Medina did note a single occasion when his client fell asleep. *See id.* at 805. The court instructed counsel to give his client "a strong jab" whenever he noticed him sleeping. *Id.* at 806. When Mr. Medina demurred on the grounds that such action could induce a heart attack, the court expressed skepticism in light of the defense's continued failure to provide detailed medical evaluations. *See id.*

On January 16, 1986, the court noted its close observation of Bisnett during the previous day's proceedings: "he was aware and awake and a very much alive, active participating defendant." *Id.* at 913. Mr. Medina explained that Bisnett had slept in the courtroom before proceedings began and during various breaks, "which would account for his seeming[ ] alertness during the proceedings." *Id.* at 913–14. The court again made specific note of Bisnett's alertness at the start of the day's afternoon session. *See id.* at 979.

On January 17, 1986, a co-defendant's counsel noted one occasion when Bisnett seemed to be falling asleep during testimony relating to a suppression motion that did not relate to him. *See id.* at 1084. The court questioned whether the conduct was feigned and again encouraged counsel to submit expert medical opinion. *See id.* at 1085. He also directed Bisnett to position himself at the defense table so that he and the testifying witness were simultaneously in his attorney's range of vision. *See id.* at 1092.

b. *Bisnett's Written Severance Motion*

On January 22, 1986, the last day of pre-trial proceedings, the court noted on the record its receipt of a written motion for a medical severance of Bisnett's trial, *see id.* at 1133, supported by an affidavit from Mr. Medina, and a "To Whom It May Concern" letter from Dr. Daniel R. Wagner, an Assistant Professor of Neurology and Psychiatry at the New York Hospital–Cornell Medical Center Sleep–Wake Disorders Center, *see* Resp't. App. at A9–A16, *People v. Bisnett*, 144 A.D.2d 567, 534 N.Y.S.2d 424.

In his affidavit, Mr. Medina asserted that his client could not presently assist in his own defense because he was falling asleep "two or three times per day during court proceedings." *Id.* at A12–A13. Moreover, when he awakens, he is often "dazed, disoriented and confused." *Id.* at A13. Counsel advised that Bisnett had only revealed the condition to his attorneys on January 5, 1986. *See id.* at A14. Nevertheless, a severance was appropriate because the condition "may be treatable." *Id.* at A15.

In his letter, Dr. Wagner stated that he had first diagnosed Bisnett with obstructive sleep apnea in 1982, but had not examined him since mid–1983. *See id.* at A16. Tests conducted in 1982 and 1983 revealed that Bisnett's apnea caused him to stop breathing while sleeping approximately 76 times per hour. On each of these occasions, Bisnett would arouse briefly from sleep without actually realizing he was doing so. As a result of these chronic sleep interruptions, Bisnett would be sleepy during the day. Based on reports given to him by others that Bisnett was involuntarily napping during court proceedings, Dr. Wagner expressed the opinion that Bisnett was still suffering from the apnea syndrome. The doctor noted that the condition was "quite treatable" and that new methods were particularly successful.

The court denied severance finding both that (1) Dr. Wagner's submission was inadequate to support the motion because it (a) was not in the form of a sworn affidavit, and (b) was not based on a recent examination of Bisnett; and (2) it was untimely given (a) Bisnett's long awareness of his condition and his failure to seek treatment a reasonable time in advance of court pro-

ceedings, and (b) counsel's delay of more than two weeks from January 6, 1986 until the eve of jury selection before formally filing for severance. *See* Trial Tr. at 1136–38, 1144–45.

#### c. *Addressing the Apnea Problem at Trial*

On January 23, 1986, as jury selection was about to begin, the court stated its willingness to accommodate Bisnett's condition in any reasonable manner during trial:

> THE COURT: ... Mr. Medina, I am advising you on the record now I will take any required actions including the stationing of a personal Court Officer or assistant from your office near Mr. Bisnett and I will stop the trial. I will read back whatever you ask me to and take such other actions as you indicate or Mr. Cutler, should he be here to assure there is no loss of your client's cooperation and aid in his own defense because of the physical condition. You will make any timely request including but not limited to any of the foregoing the Court has indicated in order to insure the maximum effectiveness in his ability to aid in his own defense. Whatever you request that is reasonable, will be given to you.
> MR. MEDINA: Very well, Your Honor.
> THE COURT: I will even give you that which is not reasonable to preclude an issue being raised.

*Id.* at 1341–42.

Later that same day, when Mr. Cutler endeavored to renew Bisnett's motion for a medical severance, the court rejected the motion, *see id.* at 1371–75, but repeated its offer to "make every accommodation ... reasonably asked of me ... I will make any instruction, any accommodation that is reasonably within my power. I have indicated I will give any adjournment, stop any proceedings at any point where I'm in good faith told ... I'm going to rely on

[defense counsel] for the good faith," *id.* at 1379.

The record reveals no defense requests for trial accommodations. Neither does it report any instance when Bisnett fell asleep at trial or experienced difficulty following the testimony or assisting counsel. To the contrary, the transcript for February 6, 1986 indicates that defense counsel specifically consulted with Bisnett before cross-examining a prosecution witness. *See id.* at 2156. Further, on February 10, 1986, defense counsel opposed a prosecution motion to remand his client by noting that Bisnett "assisted and helped me as best he can on weekends and late-evenings." *Id.* at 2530. On February 13, 1986, counsel stated that his decision to pursue certain lines of cross-examination with respect to accomplice witness Herbert Reid was made after consultation with Bisnett. *See id.* at 2557. Indeed, it appears that a long lunch recess was taken on that date precisely so that Bisnett could discuss this cross-examination with his counsel. *See id.* at 2633.

#### d. *Bisnett's Motion for a Mistrial*

On February 13, 1986, the last day of trial testimony, defense counsel moved for a mistrial based on an affidavit from Dr. Wagner indicating that he had examined Bisnett on February 4, 1986, and reached the conclusion that he was not fit either to stand trial or to assist in his defense. *See id.* at 2566–67. The court initially rejected the motion as untimely, noting that the prosecution was effectively precluded from seeking an independent medical examination, and the court was deprived of the information necessary to explore additional trial accommodations of Bisnett's condition. *See id.* at 2567–68. In the end, however, the court agreed to hold an evidentiary hearing, *see id.* at 2569, although it remarked that defense counsel had nev-

er sought a recess to accommodate his client's condition nor otherwise alerted the court to any difficulty in attorney-client consultation, and that Bisnett's sleepiness "had not been apparent" during trial, *see id.* at 2569–73. When defense counsel later insisted that his client had fallen asleep on every day of trial, the court renewed its pretrial offer to have court reporters reread any testimony Bisnett may have missed and to recall witnesses if necessary:

> I'll have the transcript read back and we will have a doctor here if necessary to make sure that he's clinically awake. We will do it over the weekend. I will do—I will do whatever is necessary to see that and I will recall all the witnesses you direct me to recall, for the purpose of examination [by] Mr. Bisnett through you—in other words, for your examination. Just name them.

*Id.* at 2633–q. After Bisnett's counsel indicated that he would need all three weeks of trial testimony reread, *see id.* at 2633–r, the court denied the request as overly broad, remarking on counsel's failure to ask for a single read back or recess in the course of the trial, *see id.* at 2663–64.[2]

On February 13, 1986, at the conclusion of accomplice witness Herbert Reid's direct trial testimony, the court questioned him outside the presence of the jury as to Bisnett's allegedly debilitating condition. Reid testified that he had interacted with Bisnett on numerous occasions throughout the charged conspiracy, often for as long as an hour at a time, during which time he had never noticed Bisnett falling asleep or having difficulty following a conversation. *See id.* at 2657–58.

The next day, February 14, 1986, the court interrupted the trial to take further testimony on the issue of Bisnett's competency from Dr. Wagner and petitioner's father-in-law, Sol Elberg. Mr. Elberg testified generally about Bisnett's penchant for falling asleep at family gatherings. *See id.* at 2862. Dr. Wagner, on the other hand, testified in some detail about sleep apnea and the possible effect of this condition on petitioner.

Dr. Wagner stated that after diagnosing Bisnett with severe sleep apnea in June 1982, he treated the condition until sometime in 1983 when a great degree of improvement was achieved through weight loss.[3] *See id.* at 2727–28. Although Dr. Wagner encouraged Bisnett to seek regular reevaluations of his condition, Bisnett both gained back all the weight he had lost and failed to have any further contact with Dr. Wagner until early January 1986 when his wife and lawyers called for an appointment. *See id.* at 2773–74, 2839–40. When Dr. Wagner examined Bisnett on February 4, 1986, he found that his apnea had worsened, so that he was experiencing 111 sleep interruptions per hour, compared to 95 when first seen in 1982 and 40 when last seen in 1983. *See id.* at 2734. A test to gauge sleepiness revealed that Bisnett could fall asleep in approximately 2.2 minutes, whereas a healthy individual usually takes more than ten minutes to fall asleep. *See id.* at 2736–37. Dr. Wagner further testified that during a fifteen-minute con-

---

**2.** During this colloquy, defense counsel asserted that at pre-trial proceedings the court had admonished him for noting on the record when his client was asleep. *See id.* at 2664. A review of the transcript fails to support this claim.

**3.** As Dr. Wagner explained, "One of the salient features of the obstructive sleep apnea syndrome is it usually occurs in people that are somewhat overweight and weight modules somewhat the syndrome. That means, someone who has it, if they gain weight it gets worse. If they lose weight, it will diminish, and in some cases disappear. It did not disappear in Mr. Bisnett's case but it got about 50 percent better." *Id.* at 2728.

versation with petitioner, Bisnett fell asleep "a couple of times." *Id.* at 2746.

Dr. Wagner stated unequivocally that apnea was treatable. *See id.* at 2772, 534 N.Y.S.2d 424. In some cases, apnea could be reversed if a patient lost weight or utilized a special device while sleeping. *See id.* at 2728, 2835–37, 534 N.Y.S.2d 424. More aggressive treatment was available through surgery, which could also cure the condition entirely. *See id.* at 2833–34, 534 N.Y.S.2d 424. These treatments took time and could not be pursued in the remaining few days of trial. *See id.* at 2843–44, 534 N.Y.S.2d 424.

When asked about Bisnett's fitness to stand trial, Dr. Wagner initially stated that "in a case of this severity, it would be extremely difficult for someone who is apparently falling asleep in the courtroom continuously to assist in their own defense." *Id.* at 2766. As the doctor explained, a defendant had to be awake to observe or hear what was going on at trial and, thus, someone who was frequently asleep could not assist his attorney. *See id.* at 2796, 2803, 2808. Dr. Wagner conceded that his opinion of Bisnett's incompetency was largely based on defense reports that petitioner was regularly falling asleep at trial. *See id.* at 2762. Without that information, the doctor's testing was insufficient to allow him to reach a conclusion as to petitioner's competency. *See id.* at 2763. Specifically, he could not express any opinion as to whether Bisnett was in fact confused or disoriented at trial. *See id.* at 2764. Indeed, in commenting on the court's observations that Bisnett appeared drowsier during times when tapes were being played for the jury than when key

witnesses such as Reid and Solomon were testifying, Dr. Wagner stated that an apnea sufferer could marshal his alertness during times that were "emotionally most striking and stimulating," conceivably for as long as nine or ten days at a time. *See id.* at 2822–24.[4] Thus, when the court asked Dr. Wagner if he could state with reasonable medical certainty how much of the trial Bisnett had failed to hear or observe because of his apnea, the doctor stated that he could not, that the loss could be as little as 1–2% or as much as 85%. *See id.* at 2818.

When told of the court's proposals for accommodating Bisnett's condition, Dr. Bisnett expressed surprise that the defense had never requested that any testimony be read back "if there has been such difficulty as he's been falling asleep so much." *Id.* at 2821. When the court asked Dr. Wagner how, short of a lengthy interruption for treatment, it could protect Bisnett's right to participate in the remainder of the trial, Dr. Wagner offered recommendations that were similar to those proposed by the court: "I suppose you could have him stand and allow him to walk around whenever he needed to and be sure that things were read back, I suppose you could." *Id.* at 2844.

On February 18, 1986, after hearing oral argument, the court denied Bisnett's motion for a mistrial. *See id.* at 2889.[5] Although defense counsel insisted that Bisnett's apnea condition made it impossible for petitioner to hear or comprehend the trial proceedings or to assist in his defense, *see id.* at 2894, the trial court observed that Bisnett was awake and consulting with counsel that very morning, *see*

---

4. Dr. Wagner also told the court that it was "certainly" possible for a person suffering from apnea to feign drowsiness. *See id.* at 2809.

5. Bisnett asserts that the state court "denied Petitioner's motion for a mistrial without affording Petitioner's attorney the opportunity for oral argument." *See* Pet'r's Mem. in Supp. at 12. This is incorrect. Counsel's argument is reported at pages 2891–94.

*id.* at 2895. Indeed, the court noted that no evidence had been adduced, whether from Bisnett himself or any other witness, supporting the claim that he had failed to hear any portions of the trial. *See id.* at 2898. The court accepted Dr. Wagner's testimony that Bisnett suffered from a recognized medical condition, but rejected the argument that the condition rendered Bisnett incompetent to stand trial. *See id.* The court noted the "great pains" it had taken to "observe the defendant during the course of this trial." *Id.* 2899. These observations suggested "no significant interruption in Mr. Bisnett's ability to comprehend and assist in his own defense." *Id.* at 2898, 534 N.Y.S.2d 424. In further support of this conclusion, the court observed that the defense had failed to avail itself of any of the procedures offered throughout trial to accommodate Bisnett's condition. *See id.*[6]

### 3. *Procedural History*

The jury found Bisnett and Wilson guilty of both criminal sale and criminal possession of a controlled substance in the first degree, as well as third degree weapon possession. Both defendants appealed to the Appellate Division, Second Department. Before that court, Bisnett asserted that (1) he was not competent to stand trial, (2) the receipt into evidence of Wilson's statement to Lt. Krebs deprived him of his Sixth Amendment right of confrontation, (3) the trial court erred in sealing the plea allocution of a cooperating co-defendant, (4) his attorney was unfairly limited in his cross-examination of a prosecution witness, (5) certain wiretaps were erroneously admitted into evidence, (6) the trial judge should have recused himself from the case, and (7) trial counsel was constitutionally ineffective.

The Appellate Division rejected these arguments as without merit and, on November 21, 1988, affirmed Bisnett's conviction. *See People v. Bisnett,* 144 A.D.2d 567, 534 N.Y.S.2d 424 (2d Dep't 1988). In addressing Bisnett's competency claim, the Appellate Division first ruled that the trial court was not obliged to hold a hearing pursuant to New York Criminal Procedure Law § 730, since that statute applied only to defendants with possible mental defects and not to those, such as Bisnett, asserting incompetency based on a physical problem. *Id.* at 568–69, 425. In the latter circumstance, the "extent and content" of any competency hearing were left to the sound discretion of the trial court. *Id.* at 569, 425. Upon review of the record, and particularly in light of the "various remedies" afforded Bisnett "to assure that he would be fully able to assist in his defense," the Appellate Division found no error in the conclusion that he was competent to stand trial. *Id.* at 569–425–26, 534 N.Y.S.2d 424. Bisnett moved for leave to appeal to the New York Court of Appeals, which request was summarily denied on January 11, 1989. *People v. Bisnett,* 73 N.Y.2d 889, 538 N.Y.S.2d 801, 535 N.E.2d 1341 (1989) (Titone, J.).

The following year, on February 20, 1990, Bisnett moved through counsel to vacate his conviction pursuant to N.Y.Crim. Pro. Law § 440.10 on the grounds that the prosecution had failed to disclose certain materials as required by *People v. Rosario,* 9 N.Y.2d 286, 213 N.Y.S.2d 448, 173 N.E.2d 881 (1961). The motion was denied as without merit on

---

**6.** Because of Bisnett's failure to utilize the proposed procedures for minimizing any adverse effects from his apnea, the court found that he had waived "any other rights he may have had." *Id.* at 2898–99. Petitioner cites this excerpt to suggest that the entire competency motion was rejected as waived. The record indicates otherwise. The motion was plainly rejected as without merit, and the waiver ruling referred only to any potential argument about the adequacy of the court's proposed procedures.

March 5, 1991, *see People v. Bisnett,* No. 5532/84, Mem. (N.Y. Sup.Ct., Kings Co. Mar. 5, 1991), and on January 11, 1992, the Appellate Division denied Bisnett leave to appeal this ruling.

On September 12, 1993, Bisnett, this time proceeding pro se, filed a second § 440.10 motion to vacate his conviction, challenging the effectiveness of his trial counsel, the trial court's finding that he was competent to stand trial, and various purported errors in the verdict sheet. On December 2, 1993, the motion was denied as procedurally barred since Bisnett's claims had all been raised or defaulted in his earlier direct and collateral attacks on his conviction. *People v. Bisnett,* No. 5532/84, Mem. (N.Y. Sup.Ct., Kings Co. Dec. 2, 1993). Leave to appeal this ruling to the Appellate Division was denied on February 8, 1994.

On April 23, 1997, Bisnett filed his pending federal petition with this court.[7]

### Discussion

#### I. *Standard of Review*

This court's review of petitioner's claim is governed by the standards articulated in AEDPA, which significantly amended the federal habeas corpus statute, 28 U.S.C. § 2254. Subsection (d) of § 2254 provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the Supreme Court provided guidance for applying these standards. Justice O'Connor, writing for a majority, stated that the phrase "clearly established Federal law, as determined by the Supreme Court of the United States" in subpart (1) should be understood to refer to "the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision." *Id.* at 412, 120 S.Ct. 1495. The Court then identified two circumstances under which a state court decision could be deemed "contrary to" clearly established federal law: when the state court (1) "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law," or (2) "decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Id.* at 413, 120 S.Ct. 1495.

As to the alternative "unreasonable application" clause, the Court held that habe-

---

7. The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214 (1996), which took effect on April 24, 1996, establishes a one-year limitations period for the filing of § 2254, generally running from the date on which a criminal judgment "became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A) (2002). AEDPA does not specifically state how its limitations provisions apply to cases such as this one, in which a prisoner's conviction became final before the statute's effective date. In *Ross v. Artuz,* 150 F.3d 97, 98 (2d Cir.1998), however, the Second Circuit ruled that such a prisoner must be afforded a one-year grace period from the statute's effective date, i.e., until April 24, 1997, to file for federal habeas relief. Bisnett's filing on April 23, 1997, one day before the expiration of the *Ross* grace period, makes his petition timely.

as relief was warranted only "if the state court identifies the correct governing legal principle from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* The Court ruled that reasonableness was to be assessed objectively rather than subjectively. *See id.* at 409–10, 120 S.Ct. 1495. Moreover, courts were cautioned that "an unreasonable application of federal law" did not equate with "an incorrect application of federal law." *Id.* at 410, 120 S.Ct. 1495. Thus, a "federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411, 120 S.Ct. 1495; *see Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000) (cautioning that while "[s]ome increment of incorrectness beyond error is required.... the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence" (quotation omitted)).

Applying these principles to this case, it is apparent that Bisnett is not entitled to habeas corpus relief.

## II. *The Question of Competency*

■ The Supreme Court has "repeatedly and consistently" ruled that due process prohibits the criminal trial of a person who is legally incompetent. *E.g. Cooper v. Oklahoma,* 517 U.S. 348, 354, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996) (and cases cited therein). A defendant is legally incompetent if "he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense." *Drope v. Missouri,* 420 U.S. 162, 171, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); *see also Dusky v. United States,* 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam) (holding that a defendant is competent if he has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding ... [and] a rational as well as factual understanding of the proceedings against him"). The Supreme Court has further interpreted due process to afford a defendant "a reasonable opportunity to demonstrate that he is not competent to stand trial." *Medina v. California,* 505 U.S. 437, 451, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992); *see also Pate v. Robinson,* 383 U.S. 375, 385, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966) (holding that where the evidence raises a bona fide doubt as to a defendant's competence to stand trial, due process requires that the trial court sua sponte conduct a competency hearing).

Bisnett submits that the trial court's failure to conduct a competency hearing in conformity with Article 730 of New York's Criminal Procedure Law deprived him of the "reasonable opportunity" mandated by due process. Specifically, he faults the trial court for not ordering an independent psychiatric examination, as required by N.Y.Crim. Pro. Law § 730.30, which provides that "the court wherein the criminal action is pending must issue an order of examination when it is of the opinion that the defendant may be an incapacitated person." In any event, he submits that the record plainly demonstrates that he was incompetent to stand trial. This court finds that neither argument has merit.

■ While due process does require that a defendant be afforded the opportunity to demonstrate that he is not competent, it does not mandate any particular procedures for resolving the issue. *See Medina v. California,* 505 U.S. at 451, 112 S.Ct. 2572. Thus, the trial court's failure to follow the procedures outlined in Article 730 raises, at most, an issue of state law. A federal habeas court, however, may not

review errors of state law. It "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire,* 502 U.S. 62, 68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991).

■ In any event, Bisnett fails to show that his case was governed by Article 730. As the Appellate Division observed in affirming petitioner's conviction, Article 730 applies only to persons who are incapacitated "as a result of *mental* disease or defect." N.Y.Crim. Pro. Law § 730.10(1) (emphasis added). Nothing in the article pertains to defendants such as Bisnett who, as a result of a *physical* problem, such as sleep apnea, claim an inability to understand the proceedings or assist in their defense. *See People v. Bisnett,* 144 A.D.2d at 568–69, 534 N.Y.S.2d at 425 (citing *People v. Francabandera,* 33 N.Y.2d 429, 435, 354 N.Y.S.2d 609, 613, 310 N.E.2d 292 (1974)) (holding that statutory definition of "incapacitated person" applied only to persons with a "mental imbalance"). A state court's interpretation of state law is, of course, binding on federal habeas review. *See Estelle v. McGuire,* 502 U.S. at 67–68, 112 S.Ct. 475 ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); *accord Davis v. Strack,* 270 F.3d 111, 123 (2d Cir.2001).

■ Thus, this court rejects Bisnett's Article 730 claim, both because it does not implicate federal law and because it is without merit even under state law. Moreover, having carefully reviewed the transcript of proceedings before the trial court, particularly Dr. Wagner's testimony, this court finds that Bisnett was afforded an adequate opportunity to present evidence that he was incompetent to stand trial. This part of his due process claim is rejected as without merit.

■ Similarly without merit is Bisnett's claim that the state court erred in its ultimate finding that he was competent to stand trial. Preliminarily, this court notes that a trial judge's findings with respect to competency are generally accorded great deference and, even on direct review, will be upheld "unless clearly erroneous." *United States v. Nichols,* 56 F.3d 403, 411 (2d Cir.1995). Thus, Bisnett's burden on this collateral challenge is particularly heavy. *See generally Francis S. v. Stone,* 221 F.3d at 114 (noting that issue of whether "person is mentally incompetent to stand trial ... has generally been held to be an issue of fact, entitled to deference by a federal habeas corpus court").

In an effort to meet that burden, petitioner relies primarily on the opinion of his physician, Dr. Wagner, that Bisnett was not fit to stand trial. He submits that the trial court was obliged to accept this opinion since the prosecution offered no contrary expert evidence. Indeed, Bisnett suggests that the trial court's failure to do so impermissibly shifted the burden of proof on the issue of competency to the defense.

■ Both arguments merit little discussion. In *Maggio v. Fulford,* 462 U.S. 111, 117–18, 103 S.Ct. 2261, 76 L.Ed.2d 794 (1983) (per curiam), the Supreme Court expressly ruled that a trial judge was not required to accept an unimpeached expert's opinion that a defendant was incompetent. Further, in *Medina v. California,* 505 U.S. at 449, 112 S.Ct. 2572, the Supreme Court held that placing the burden of proving incompetency on a criminal defendant did not violate due process. *C.f. Cooper v. Oklahoma,* 517 U.S. at 355–56, 116 S.Ct. 1373 (holding that although state could require defendant to prove incompetency by a preponderance of the evidence, it could not impose the higher burden of "clear and convincing" proof).

This court notes that the record in Bisnett's case does not indicate precisely

where the trial court assigned the burden of proof on the issue of competency. This is not surprising. Precisely because competency determinations are made by a preponderance of the evidence, allocation of the burden of proof is significant "only in a narrow class of cases where the evidence is in equipoise; that is, where the evidence that a defendant is competent is just as strong as the evidence that he is incompetent." *Medina v. California*, 505 U.S. at 449, 112 S.Ct. 2572. This, however, was not such a case. The hearing evidence, including the testimony of the defense medical expert, strongly supported the trial judge's finding of competency.

Specifically, when Dr. Wagner testified, he acknowledged that his opinion that Bisnett was incompetent to stand trial depended on defense reports that petitioner was frequently falling asleep in court. *See* Trial Tr. at 2762–63. Such reports, however, were directly contrary to the trial judge's own observations. *See id.* at 2573 (noting that Bisnett's sleepiness "has not been apparent" during trial). The trial court acted well within its discretion in rejecting an expert opinion based on inaccurate facts. *See Maggio v. Fulford*, 462 U.S. at 117–18, 103 S.Ct. 2261.

Of course, the trial judge in this case not only observed Bisnett carefully throughout trial, he also had had the opportunity to speak with petitioner directly during an extensive, albeit aborted, plea allocution. Nothing in that exchange suggested that Bisnett would have any difficulty communicating with counsel or assisting in his defense. *See* Trial Tr. at 353. Neither did the testimony of Bisnett's long-time accomplice, Herbert Reid, who reported extensive and cogent conversations with petitioner in furtherance of their drug operation. *See id.* at 2657–58.

Nevertheless, to ensure that Bisnett had every opportunity to assist meaningfully in his defense, the court repeatedly offered to entertain reasonable requests for accommodations of petitioner's condition. Specifically, it took extended breaks before the cross-examination of important prosecution witnesses to allow Bisnett to consult with counsel. *See id.* at 2156, 2633. It offered to allow petitioner to stand or walk about to maintain alertness and to read back portions of the trial transcript for periods when petitioner's attention wandered. *See id.* at 1341–42, 2633–q, 2844. Bisnett's failure to avail himself of these opportunities or to demonstrate their inadequacy was, as Dr. Wagner himself remarked, inexplicable if his apnea was as debilitating as he claimed. *See id.* at 2821. Of course, as Dr. Wagner acknowledged, apnea could be feigned. *See id.* at 2809. Moreover, he could not testify with medical certainty to the degree of Bisnett's lost comprehension at trial. *See id.* at 2828. This was because apnea sufferers could marshal their alertness for extended periods of time when confronted with a "striking or stimulating" situation. *Id.* at 2823–24. This was consistent with the court's observations of Bisnett's acute attentiveness during critical portions of the trial, such as the testimony of accomplice witnesses Reid and Solomon.

Providing circumstantial support for the trial judge's competency finding was the fact that defense counsel never raised any concern until January 6, 1986, when Bisnett apprised them of his apnea history. Before then, apparently, nothing about his demeanor had alerted them to a possible competency problem. Also, the evidence showed that Bisnett made no effort to obtain treatment for his condition in the weeks and months preceding trial, a revealing omission in light of past medical success ameliorating his apnea.

Because the totality of evidence supports Bisnett's competency to stand trial, particularly with the accommodations offered by the state court, this court must

reject Bisnett's due process challenge to his conviction as without merit. It finds that petitioner has failed to show that the state court ruling was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Neither has he shown that the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." *Id.* at 2254(d)(1).

## III. *Ineffective Assistance of Counsel*

Bisnett asserts that retained trial counsel were constitutionally ineffective in failing (1) promptly to investigate his medical condition and challenge his competency to stand trial, and (2) to move for a severance based on the prosecution's offer of co-defendant Alonzo Wilson's confession.

The Supreme Court has clearly ruled that a prisoner raising a Sixth Amendment challenge to the assistance of counsel must demonstrate both (1) that counsel's performance was so unreasonable under prevailing professional norms that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and (2) that counsel's ineffectiveness prejudiced the petitioner such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694, 104 S.Ct. 2052. In applying this test, a reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound [legal] strategy.'" *Id.* at 689, 104 S.Ct. 2052 (quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). Paramount to the court's consideration of

any claim of ineffectiveness is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 689, 104 S.Ct. 2052. Applying these principles to this case, the court finds that Bisnett cannot satisfy the *Strickland* standard.

### A. *Failure to Investigate*

 Under the first prong of *Strickland,* a criminal defense attorney is expected to make reasonable investigations into the factual issues presented in a case. *See Strickland v. Washington,* 466 U.S. at 691, 104 S.Ct. 2052. This would necessarily include the question of whether a client is competent to stand trial. Complaints about an attorney's failure to investigate relevant facts must, however, be assessed in light of "all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* A critical factor in determining the reasonableness of counsel's actions may be "defendant's own statements or actions." *Id.*

 Bisnett complains that his attorneys were dilatory in investigating his apnea condition and urging it as a ground for severance. The state court record, however, indicates that counsel neither knew nor suspected that Bisnett had apnea until he revealed this fact to them in early January of 1986. Once so alerted, counsel promptly advised the court that the condition might support a motion for severance. On January 9, 1986, they made an oral motion, which they renewed on formal papers submitted January 22, 1986. In the interim, they explored the possibility of a guilty plea, considered trying the case to the bench rather than a jury, and represented Bisnett at a week-long suppression hearing. This hardly evidences counsels' inattentiveness to their client's defense. In denying the medical severance motion, the trial court did fault counsel for not seeking

relief sooner, but the criticism was plainly directed more at Bisnett than at his attorneys. As the court noted, he had long known of his apnea problem; nevertheless, he had failed to seek the treatment that he knew could ameliorate his condition.

This court concludes that Bisnett's trial counsel cannot be labeled constitutionally ineffective for failing earlier to investigate a medical severance when the record plainly shows that it was petitioner himself who failed (1) promptly to alert them to his known condition, and (2) to seek available treatment.

Even if Bisnett could satisfy the first prong of *Strickland* on this part of his ineffective assistance claim, he would still not be entitled to habeas relief since he cannot demonstrate prejudice. Specifically, he cannot show that counsel's delay deprived him of the opportunity for necessary medical treatment. As already noted, in January 1986, Bisnett knew far more than his attorneys about his condition and its responsiveness to treatment. Any delay in treatment is thus more a result of his own deliberate inaction than that of his attorneys. Neither can Bisnett claim that delay by counsel deprived him of a competency hearing. The trial court interrupted trial for this exact purpose. Moreover, at the hearing, Bisnett's treating physician, Dr. Wagner, testified extensively about sleep apnea, about his past treatment of petitioner for this condition, and about his recent examination. For the reasons discussed, *supra*, the trial judge found that Bisnett was competent, but counsel cannot be labeled constitutionally ineffective for failing to persuade the court otherwise, certainly not where, as here, petitioner fails to demonstrate that an earlier investigation might have uncovered more helpful evidence. Finally, to the extent Bisnett argues that he was prejudiced because his motion was not heard on the merits but, rather, rejected as untimely and waived,

the claim, as noted *supra* at footnote 6, is not factually supported by the record.

## B. *Failure to Make Bruton Motion for Severance*

In *Bruton v. United States,* 391 U.S. 123, 126, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Supreme Court ruled that the Sixth Amendment right of confrontation was violated when one defendant's confession implicating a co-defendant was admitted at their joint trial. Bisnett submits that the *Bruton* rule prohibited the admission of Alonzo Wilson's August 1, 1984 statements to Lt. Krebs at their joint trial, and that his counsel's failure to move for a severance or redaction constituted constitutionally ineffective representation. The court disagrees.

Wilson's August 1, 1984 conversation with Lt. Krebs did not constitute a "confession" limited by *Bruton.* Rather, it was a co-conspirator statement made in furtherance of the Caton Avenue drug conspiracy. The encounter between Wilson and Krebs may have originated in a traffic stop, but Wilson did not subsequently engage in a confessional account of past misdeeds. Instead, his singular purpose in speaking to Krebs, whom he believed to be a corrupt officer, was to ensure future protection for the organization's drug activities. Because a preponderance of the evidence before the trial court established the existence of this drug conspiracy, Wilson and Bisnett's membership in it, and Wilson's effort to further its criminal goals through his conversation with Krebs, Wilson's August 1, 1986 statement was admissible against Bisnett under the co-conspirator exception to the hearsay rule whether at a single or joint trial. *See generally United States v. McCown,* 711 F.2d 1441, 1448–49 (9th Cir.1983) (holding *Bruton* inapplicable to statements admissible under co-conspirator exception to the hearsay rule); *United States v. Kendricks,* 623 F.2d 1165, 1167 (6th Cir.1980) (same); *see*

also *United States v. Garcia*, 893 F.2d 188, 190 (8th Cir.1990) (holding that a statement made to a security guard investigating declarant's use of counterfeit money came within co-conspirator exception because its purpose was to delay or prevent arrest thereby allowing conspiracy to continue). Since the co-conspirator exception to the hearsay rule plainly does not implicate the Confrontation Clause, *see Bourjaily v. United States*, 483 U.S. 171, 181–83, 107 S.Ct. 2775, 97 L.Ed.2d 144, (1987), the failure of Bisnett's counsel to move for severance or redaction satisfies neither prong of *Strickland.*

Petitioner's Sixth Amendment claim that he was denied effective assistance of counsel is denied as without merit.

### Conclusion

For the reasons stated, the court finds both Bisnett's due process and Sixth Amendment challenge to his conviction to be without merit. His petition for a writ of habeas corpus is denied as is a certificate of appealability.

*SO ORDERED.*